WORLD-WIDE VOLKSWAGEN CORP. ET AL. *v.* WOODSON, DISTRICT JUDGE OF CREEK COUNTY, OKLAHOMA, ET AL.

No. 78–1078.   Argued October 3, 1979—Decided January 21, 1980

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, POWELL, REHNQUIST, and STEVENS, JJ., joined. BRENNAN, J., filed a dissenting opinion, *post,* p. 299. MARSHALL, J., filed a dissenting opinion, in which BLACKMUN, J., joined, *post,* p. 313. BLACKMUN, J., filed a dissenting opinion, *post,* p. 317.

*Herbert Rubin* argued the cause for petitioners. With him on the briefs were *Dan A. Rogers, Bernard J. Wald,* and *Ian Ceresney.*

*Jefferson G. Greer* argued the cause for respondents. With him on the brief was *Charles A. Whitebook.*

MR. JUSTICE WHITE delivered the opinion of the Court.

The issue before us is whether, consistently with the Due Process Clause of the Fourteenth Amendment, an Oklahoma court may exercise *in personam* jurisdiction over a nonresident automobile retailer and its wholesale distributor in a products-liability action, when the defendants' only connection with Oklahoma is the fact that an automobile sold in New York to New York residents became involved in an accident in Oklahoma.

## I

Respondents Harry and Kay Robinson purchased a new Audi automobile from petitioner Seaway Volkswagen, Inc. (Seaway), in Massena, N. Y., in 1976. The following year the Robinson family, who resided in New York, left that State for a new home in Arizona. As they passed through the State of Oklahoma, another car struck their Audi in the rear, causing a fire which severely burned Kay Robinson and her two children.[1]

The Robinsons[2] subsequently brought a products-liability action in the District Court for Creek County, Okla., claiming that their injuries resulted from defective design and placement of the Audi's gas tank and fuel system. They joined as defendants the automobile's manufacturer, Audi NSU Auto Union Aktiengesellschaft (Audi); its importer, Volkswagen of America, Inc. (Volkswagen); its regional distributor, petitioner World-Wide Volkswagen Corp. (World-Wide); and its retail dealer, petitioner Seaway. Seaway and World-Wide entered special appearances,[3] claiming that Oklahoma's exercise of jurisdiction over them would offend the limitations on the State's jurisdiction imposed by the Due Process Clause of the Fourteenth Amendment.[4]

The facts presented to the District Court showed that World-Wide is incorporated and has its business office in New

---

[1] The driver of the other automobile does not figure in the present litigation.

[2] Kay Robinson sued on her own behalf. The two children sued through Harry Robinson as their father and next friend.

[3] Volkswagen also entered a special appearance in the District Court, but unlike World-Wide and Seaway did not seek review in the Supreme Court of Oklahoma and is not a petitioner here. Both Volkswagen and Audi remain as defendants in the litigation pending before the District Court in Oklahoma.

[4] The papers filed by the petitioners also claimed that the District Court lacked "venue of the subject matter," App. 9, or "venue over the subject matter," *id.*, at 11.

York. It distributes vehicles, parts, and accessories, under contract with Volkswagen, to retail dealers in New York, New Jersey, and Connecticut. Seaway, one of these retail dealers, is incorporated and has its place of business in New York. Insofar as the record reveals, Seaway and World-Wide are fully independent corporations whose relations with each other and with Volkswagen and Audi are contractual only. Respondents adduced no evidence that either World-Wide or Seaway does any business in Oklahoma, ships or sells any products to or in that State, has an agent to receive process there, or purchases advertisements in any media calculated to reach Oklahoma. In fact, as respondents' counsel conceded at oral argument, Tr. of Oral Arg. 32, there was no showing that any automobile sold by World-Wide or Seaway has ever entered Oklahoma with the single exception of the vehicle involved in the present case.

Despite the apparent paucity of contacts between petitioners and Oklahoma, the District Court rejected their constitutional claim and reaffirmed that ruling in denying petitioners' motion for reconsideration.[5] Petitioners then sought a writ of prohibition in the Supreme Court of Oklahoma to restrain the District Judge, respondent Charles S. Woodson, from exercising *in personam* jurisdiction over them. They renewed their contention that, because they had no "minimal contacts," App. 32, with the State of Oklahoma, the actions of the District Judge were in violation of their rights under the Due Process Clause.

The Supreme Court of Oklahoma denied the writ, 585 P. 2d 351 (1978),[6] holding that personal jurisdiction over petitioners was authorized by Oklahoma's "long-arm" statute,

---

[5] The District Court's rulings are unreported, and appear at App. 13 and 20.

[6] Five judges joined in the opinion. Two concurred in the result, without opinion, and one concurred in part and dissented in part, also without opinion.

Okla. Stat., Tit. 12, § 1701.03 (a)(4) (1971).[7]  Although the court noted that the proper approach was to test jurisdiction against both statutory and constitutional standards, its analysis did not distinguish these questions, probably because § 1701.03 (a)(4) has been interpreted as conferring jurisdiction to the limits permitted by the United States Constitution.[8]  The court's rationale was contained in the following paragraph, 585 P. 2d, at 354:

> "In the case before us, the product being sold and distributed by the petitioners is by its very design and purpose so mobile that petitioners can foresee its possible use in Oklahoma.  This is especially true of the distributor, who has the exclusive right to distribute such automobile in New York, New Jersey and Connecticut.  The evidence presented below demonstrated that goods sold and distributed by the petitioners were used in the State of Oklahoma, and under the facts we believe it reasonable to infer, given the retail value of the automobile, that the petitioners derive substantial income from automobiles which from time to time are used in the State of Oklahoma.  This being the case, we hold that under the facts presented, the trial court was justified in con-

---

[7] This subsection provides:

"A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action or claim for relief arising from the person's . . . causing tortious injury in this state by an act or omission outside this state if he regularly does or solicits business or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in this state. . . ."

The State Supreme Court rejected jurisdiction based on § 1701.03 (a)(3), which authorizes jurisdiction over any person "causing tortious injury in this state by an act or omission in this state."  Something in addition to the infliction of tortious injury was required.

[8] *Fields* v. *Volkswagen of America, Inc.*, 555 P. 2d 48 (Okla. 1976); *Carmack* v. *Chemical Bank New York Trust Co.*, 536 P. 2d 897 (Okla. 1975); *Hines* v. *Clendenning*, 465 P. 2d 460 (Okla. 1970).

cluding that the petitioners derive substantial revenue from goods used or consumed in this State."

We granted certiorari, 440 U. S. 907 (1979), to consider an important constitutional question with respect to state-court jurisdiction and to resolve a conflict between the Supreme Court of Oklahoma and the highest courts of at least four other States.[9] We reverse.

## II

The Due Process Clause of the Fourteenth Amendment limits the power of a state court to render a valid personal judgment against a nonresident defendant. *Kulko* v. *California Superior Court*, 436 U. S. 84, 91 (1978). A judgment rendered in violation of due process is void in the rendering State and is not entitled to full faith and credit elsewhere. *Pennoyer* v. *Neff*, 95 U. S. 714, 732–733 (1878). Due process requires that the defendant be given adequate notice of the suit, *Mullane* v. *Central Hanover Trust Co.*, 339 U. S. 306, 313–314 (1950), and be subject to the personal jurisdiction of the court, *International Shoe Co.* v. *Washington*, 326 U. S. 310 (1945). In the present case, it is not contended that notice was inadequate; the only question is whether these particular petitioners were subject to the jurisdiction of the Oklahoma courts.

As has long been settled, and as we reaffirm today, a state court may exercise personal jurisdiction over a nonresident defendant only so long as there exist "minimum contacts" between the defendant and the forum State. *International Shoe Co.* v. *Washington, supra,* at 316. The concept of minimum contacts, in turn, can be seen to perform two related, but

---

[9] Cf. *Tilley* v. *Keller Truck & Implement Corp.*, 200 Kan. 641, 438 P. 2d 128 (1968); *Granite States Volkswagen, Inc.* v. *District Court*, 177 Colo. 42, 492 P. 2d 624 (1972); *Pellegrini* v. *Sachs & Sons*, 522 P. 2d 704 (Utah 1974); *Oliver* v. *American Motors Corp.*, 70 Wash. 2d 875, 425 P. 2d 647 (1967).

distinguishable, functions. It protects the defendant against the burdens of litigating in a distant or inconvenient forum. And it acts to ensure that the States, through their courts, do not reach out beyond the limits imposed on them by their status as coequal sovereigns in a federal system.

The protection against inconvenient litigation is typically described in terms of "reasonableness" or "fairness." We have said that the defendant's contacts with the forum State must be such that maintenance of the suit "does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co.* v. *Washington, supra,* at 316, quoting *Milliken* v. *Meyer,* 311 U. S. 457, 463 (1940). The relationship between the defendant and the forum must be such that it is "reasonable . . . to require the corporation to defend the particular suit which is brought there." 326 U. S., at 317. Implicit in this emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including the forum State's interest in adjudicating the dispute, see *McGee* v. *International Life Ins. Co.,* 355 U. S. 220, 223 (1957); the plaintiff's interest in obtaining convenient and effective relief, see *Kulko* v. *California Superior Court, supra,* at 92, at least when that interest is not adequately protected by the plaintiff's power to choose the forum, cf. *Shaffer* v. *Heitner,* 433 U. S. 186, 211, n. 37 (1977); the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies, see *Kulko* v. *California Superior Court, supra,* at 93, 98.

The limits imposed on state jurisdiction by the Due Process Clause, in its role as a guarantor against inconvenient litigation, have been substantially relaxed over the years. As we noted in *McGee* v. *International Life Ins. Co., supra,* at 222–

223, this trend is largely attributable to a fundamental transformation in the American economy:

> "Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity."

The historical developments noted in *McGee,* of course, have only accelerated in the generation since that case was decided.

Nevertheless, we have never accepted the proposition that state lines are irrelevant for jurisdictional purposes, nor could we, and remain faithful to the principles of interstate federalism embodied in the Constitution. The economic interdependence of the States was foreseen and desired by the Framers. In the Commerce Clause, they provided that the Nation was to be a common market, a "free trade unit" in which the States are debarred from acting as separable economic entities. *H. P. Hood & Sons, Inc.* v. *Du Mond,* 336 U. S. 525, 538 (1949). But the Framers also intended that the States retain many essential attributes of sovereignty, including, in particular, the sovereign power to try causes in their courts. The sovereignty of each State, in turn, implied a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment.

Hence, even while abandoning the shibboleth that "[t]he authority of every tribunal is necessarily restricted by the territorial limits of the State in which it is established," *Pennoyer* v. *Neff, supra,* at 720, we emphasized that the reasonableness of asserting jurisdiction over the defendant must be assessed "in the context of our federal system of govern-

ment," *International Shoe Co.* v. *Washington,* 326 U. S., at 317, and stressed that the Due Process Clause ensures not only fairness, but also the "orderly administration of the laws," *id.,* at 319. As we noted in *Hanson* v. *Denckla,* 357 U. S. 235, 250–251 (1958):

> "As technological progress has increased the flow of commerce between the States, the need for jurisdiction over nonresidents has undergone a similar increase. At the same time, progress in communications and transportation has made the defense of a suit in a foreign tribunal less burdensome. In response to these changes, the requirements for personal jurisdiction over nonresidents have evolved from the rigid rule of *Pennoyer* v. *Neff,* 95 U. S. 714, to the flexible standard of *International Shoe Co.* v. *Washington,* 326 U. S. 310. But it is a mistake to assume that this trend heralds the eventual demise of all restrictions on the personal jurisdiction of state courts. [Citation omitted.] Those restrictions are more than a guarantee of immunity from inconvenient or distant litigation. They are a consequence of territorial limitations on the power of the respective States."

Thus, the Due Process Clause "does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations." *International Shoe Co.* v. *Washington, supra,* at 319. Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment. *Hanson* v. *Denckla, supra,* at 251, 254.

## III

Applying these principles to the case at hand,[10] we find in the record before us a total absence of those affiliating circumstances that are a necessary predicate to any exercise of state-court jurisdiction. Petitioners carry on no activity whatsoever in Oklahoma. They close no sales and perform no services there. They avail themselves of none of the privileges and benefits of Oklahoma law. They solicit no business there either through salespersons or through advertising reasonably calculated to reach the State. Nor does the record show that they regularly sell cars at wholesale or retail to Oklahoma customers or residents or that they indirectly, through others, serve or seek to serve the Oklahoma market. In short, respondents seek to base jurisdiction on one, isolated occurrence and whatever inferences can be drawn therefrom: the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma.

It is argued, however, that because an automobile is mobile by its very design and purpose it was "foreseeable" that the Robinsons' Audi would cause injury in Oklahoma. Yet "foreseeability" alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause. In *Hanson* v. *Denckla, supra,* it was no doubt foreseeable that the settlor of a Delaware trust would subsequently move to Florida and seek to exercise a power of appointment there; yet we held that Florida courts could not constitutionally

---

[10] Respondents argue, as a threshold matter, that petitioners waived any objections to personal jurisdiction by (1) joining with their special appearances a challenge to the District Court's subject-matter jurisdiction, see n. 4, *supra,* and (2) taking depositions on the merits of the case in Oklahoma. The trial court, however, characterized the appearances as "special," and the Oklahoma Supreme Court, rather than finding jurisdiction waived, reached and decided the statutory and constitutional questions. Cf. *Kulko* v. *California Superior Court,* 436 U. S. 84, 91, n. 5 (1978).

exercise jurisdiction over a Delaware trustee that had no other contacts with the forum State. In *Kulko* v. *California Superior Court,* 436 U. S. 84 (1978), it was surely "foreseeable" that a divorced wife would move to California from New York, the domicile of the marriage, and that a minor daughter would live with the mother. Yet we held that California could not exercise jurisdiction in a child-support action over the former husband who had remained in New York.

If foreseeability were the criterion, a local California tire retailer could be forced to defend in Pennsylvania when a blowout occurs there, see *Erlanger Mills, Inc.* v. *Cohoes Fibre Mills, Inc.,* 239 F. 2d 502, 507 (CA4 1956) ; a Wisconsin seller of a defective automobile jack could be haled before a distant court for damage caused in New Jersey, *Reilly* v. *Phil Tolkan Pontiac, Inc.,* 372 F. Supp. 1205 (NJ 1974) ; or a Florida soft-drink concessionaire could be summoned to Alaska to account for injuries happening there, see *Uppgren* v. *Executive Aviation Services, Inc.,* 304 F. Supp. 165, 170–171 (Minn. 1969). Every seller of chattels would in effect appoint the chattel his agent for service of process. His amenability to suit would travel with the chattel. We recently abandoned the outworn rule of *Harris* v. *Balk,* 198 U. S. 215 (1905), that the interest of a creditor in a debt could be extinguished or otherwise affected by any State having transitory jurisdiction over the debtor. *Shaffer* v. *Heitner,* 433 U. S. 186 (1977). Having interred the mechanical rule that a creditor's amenability to a *quasi in rem* action travels with his debtor, we are unwilling to endorse an analogous principle in the present case.[11]

---

[11] Respondents' counsel, at oral argument, see Tr. of Oral Arg. 19–22, 29, sought to limit the reach of the foreseeability standard by suggesting that there is something unique about automobiles. It is true that automobiles are uniquely mobile, see *Tyson* v. *Whitaker & Son, Inc.,* 407 A. 2d 1, 6, and n. 11 (Me. 1979) (McKusick, C. J.), that they did play a crucial role in the expansion of personal jurisdiction through the fiction of implied consent, *e. g., Hess* v. *Pawloski,* 274 U. S. 352 (1927), and that

This is not to say, of course, that foreseeability is wholly irrelevant. But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. See *Kulko* v. *California Superior Court, supra,* at 97–98; *Shaffer* v. *Heitner,* 433 U. S., at 216; and see. *id.,* at 217–219 (STEVENS, J., concurring in judgment). The Due Process Clause, by ensuring the "orderly administration of the laws," *International Shoe Co.* v. *Washington,* 326 U. S., at 319, gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit.

When a corporation "purposefully avails itself of the privilege of conducting activities within the forum State," *Hanson* v. *Denckla,* 357 U. S., at 253, it has clear notice that it is subject to suit there, and can act to alleviate the risk of burdensome litigation by procuring insurance, passing the expected costs on to customers, or, if the risks are too great, severing its connection with the State. Hence if the sale of a product of a manufacturer or distributor such as Audi or Volkswagen is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve, directly or indirectly, the market for its product in other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others. The forum State does not

---

some of the cases have treated the automobile as a "dangerous instrumentality." But today, under the regime of *International Shoe,* we see no difference for jurisdictional purposes between an automobile and any other chattel. The "dangerous instrumentality" concept apparently was never used to support personal jurisdiction; and to the extent it has relevance today it bears not on jurisdiction but on the possible desirability of imposing substantive principles of tort law such as strict liability.

exceed its powers under the Due Process Clause if it asserts personal jurisdiction over a corporation that delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State. Cf. *Gray* v. *American Radiator & Standard Sanitary Corp.*, 22 Ill. 2d 432, 176 N. E. 2d 761 (1961).

But there is no such or similar basis for Oklahoma jurisdiction over World-Wide or Seaway in this case. Seaway's sales are made in Massena, N. Y. World-Wide's market, although substantially larger, is limited to dealers in New York, New Jersey, and Connecticut. There is no evidence of record that any automobiles distributed by World-Wide are sold to retail customers outside this tristate area. It is foreseeable that the purchasers of automobiles sold by World-Wide and Seaway may take them to Oklahoma. But the mere "unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Hanson* v. *Denckla, supra,* at 253.

In a variant on the previous argument, it is contended that jurisdiction can be supported by the fact that petitioners earn substantial revenue from goods used in Oklahoma. The Oklahoma Supreme Court so found, 585 P. 2d, at 354–355, drawing the inference that because one automobile sold by petitioners had been used in Oklahoma, others might have been used there also. While this inference seems less than compelling on the facts of the instant case, we need not question the court's factual findings in order to reject its reasoning.

This argument seems to make the point that the purchase of automobiles in New York, from which the petitioners earn substantial revenue, would not occur *but for* the fact that the automobiles are capable of use in distant States like Oklahoma. Respondents observe that the very purpose of an automobile is to travel, and that travel of automobiles sold by petitioners is facilitated by an extensive chain of Volkswagen service centers throughout the country, including some in Okla-

homa.[12]  However, financial benefits accruing to the defendant from a collateral relation to the forum State will not support jurisdiction if they . do not stem from a constitutionally cognizable contact with that State.  See *Kulko* v. *California Superior Court,* 436 U. S., at 94–95.  In our view, whatever marginal revenues petitioners may receive by virtue of the fact that their products are capable of use in Oklahoma is far too attenuated a contact to justify that State's exercise of *in personam* jurisdiction over them.

Because we find that petitioners have no "contacts, ties, or relations" with the State of Oklahoma, *International Shoe Co.* v. *Washington, supra,* at 319, the judgment of the Supreme Court of Oklahoma is

*Reversed.*

MR. JUSTICE BRENNAN, dissenting.*

The Court holds that the Due Process Clause of the Fourteenth Amendment bars the States from asserting jurisdiction over the defendants in these two cases.  In each case the Court so decides because it fails to find the "minimum contacts" that have been required since *International Shoe Co.* v. *Washington,* 326 U. S. 310, 316 (1945).  Because I believe that the Court reads *International Shoe* and its progeny too narrowly, and because I believe that the standards enunciated by those cases may already be obsolete as constitutional boundaries, I dissent.

I

The Court's opinions focus tightly on the existence of contacts between the forum and the defendant.  In so doing, they accord too little weight to the strength of the forum State's interest in the case and fail to explore whether there

---

[12] As we have noted, petitioners earn no direct revenues from these service centers.  See *supra,* at 289.

*[This opinion applies also to No. 78–952, *Rush et al.* v. *Savchuk, post,* p. 320.]

would be any actual inconvenience to the defendant. The essential inquiry in locating the constitutional limits on state-court jurisdiction over absent defendants is whether the particular exercise of jurisdiction offends " 'traditional notions of fair play and substantial justice.' " *International Shoe, supra,* at 316, quoting *Milliken* v. *Meyer,* 311 U. S. 457, 463 (1940). The clear focus in *International Shoe* was on fairness and reasonableness. *Kulko* v. *California Superior Court,* 436 U. S. 84, 92 (1978). The Court specifically declined to establish a mechanical test based on the quantum of contacts between a State and the defendant:

> "Whether due process is satisfied must depend rather upon the quality and nature of the activity *in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure.* That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has *no* contacts, ties, or relations." 326 U. S., at 319 (emphasis added).

The existence of contacts, so long as there were some, was merely one way of giving content to the determination of fairness and reasonableness.

Surely *International Shoe* contemplated that the significance of the contacts necessary to support jurisdiction would diminish if some other consideration helped establish that jurisdiction would be fair and reasonable. The interests of the State and other parties in proceeding with the case in a particular forum are such considerations. *McGee* v. *International Life Ins. Co.,* 355 U. S. 220, 223 (1957), for instance, accorded great importance to a State's "manifest interest in providing effective means of redress" for its citizens. See also *Kulko* v. *California Superior Court, supra,* at 92; *Shaffer* v. *Heitner,* 433 U. S. 186, 208 (1977); *Mullane* v. *Central Hanover Trust Co.,* 339 U. S. 306, 313 (1950).

Another consideration is the actual burden a defendant

must bear in defending the suit in the forum.   *McGee, supra.*
Because lesser burdens reduce the unfairness to the defend-
ant, jurisdiction may be justified despite less significant con-
tacts.   The burden, of course, must be of constitutional di-
mension.   Due process limits on jurisdiction do not protect
a defendant from all inconvenience of travel, *McGee, supra,*
at 224, and it would not be sensible to make the constitutional
rule turn solely on the number of miles the defendant must
travel to the courtroom.[1]   Instead, the constitutionally sig-
nificant "burden" to be analyzed relates to the mobility of
the defendant's defense.   For instance, if having to travel
to a foreign forum would hamper the defense because wit-
nesses or evidence or the defendant himself were immobile, or
if there were a disproportionately large number of witnesses
or amount of evidence that would have to be transported at
the defendant's expense, or if being away from home for the
duration of the trial would work some special hardship on the
defendant, then the Constitution would require special con-
sideration for the defendant's interests.

That considerations other than contacts between the forum
and the defendant are relevant necessarily means that the
Constitution does not require that trial be held in the State
which has the "best contacts" with the defendant.   See
*Shaffer* v. *Heitner, supra,* at 228 (BRENNAN, J., dissenting).
The defendant has no constitutional entitlement to the best
forum or, for that matter, to any particular forum.   Under
even the most restrictive view of *International Shoe,* several
States could have jurisdiction over a particular cause of action.
We need only determine whether the forum States in these
cases satisfy the constitutional minimum.[2]

---

[1] In fact, a courtroom just across the state line from a defendant may
often be far more convenient for the defendant than a courtroom in a dis-
tant corner of his own State.

[2] The States themselves, of course, remain free to choose whether to
extend their jurisdiction to embrace all defendants over whom the Con-
stitution would permit exercise of jurisdiction.

## II

In each of these cases, I would find that the forum State has an interest in permitting the litigation to go forward, the litigation is connected to the forum, the defendant is linked to the forum, and the burden of defending is not unreasonable. Accordingly, I would hold that it is neither unfair nor unreasonable to require these defendants to defend in the forum State.

### A

In No. 78–952, a number of considerations suggest that Minnesota is an interested and convenient forum. The action was filed by a bona fide resident of the forum.[3] Consequently, Minnesota's interests are similar to, even if lesser than, the interests of California in *McGee, supra,* "in providing a forum for its residents and in regulating the activities of insurance companies" doing business in the State.[4] *Post,* at 332. Moreover, Minnesota has "attempted to assert [its] particularized interest in trying such cases in its courts by . . . enacting a special jurisdictional statute." *Kulko, supra,* at 98; *McGee, supra,* at 221, 224. As in *McGee,* a resident forced to travel to a distant State to prosecute an action

---

[3] The plaintiff asserted jurisdiction pursuant to Minn. Stat. § 571.41, subd. 2 (1978), which allows garnishment of an insurer's obligation to defend and indemnify its insured. See *post,* at 322–323, n. 3, and accompanying text. The Minnesota Supreme Court has interpreted the statute as allowing suit only to the insurance policy's liability limit. The court has held that the statute embodies the rule of *Seider* v. *Roth,* 17 N. Y. 2d 111, 216 N. E. 2d 312 (1966).

[4] To say that these considerations are relevant is a far cry from saying that they are "substituted for . . . contacts with the defendant and the cause of action." *Post,* at 332. The forum's interest in the litigation is an independent point of inquiry even under traditional readings of *International Shoe*'s progeny. If there is a shift in focus, it is not away from "the relationship *among* the defendant, the forum, and the litigation." *Post,* at 332 (emphasis added). Instead it is a shift within the same accepted relationship from the connections *between* the defendant and the forum to those between the forum and the litigation.

against someone who has injured him could, for lack of funds, be entirely unable to bring the cause of action. The plaintiff's residence in the State makes the State one of a very few convenient fora for a personal injury case (the others usually being the defendant's home State and the State where the accident occurred).[5]

In addition, the burden on the defendant is slight. As Judge Friendly has recognized, *Shaffer* emphasizes the importance of identifying the real impact of the lawsuit. *O'Connor* v. *Lee-Hy Paving Corp.*, 579 F. 2d 194, 200 (CA2 1978) (upholding the constitutionality of jurisdiction in a very similar case under New York's law after *Shaffer*). Here the real impact is on the defendant's insurer, which is concededly amenable to suit in the forum State. The defendant is carefully protected from financial liability because the action limits the prayer for damages to the insurance policy's liability limit.[6] The insurer will handle the case for the defendant. The defendant is only a nominal party who need be no more active in the case than the cooperation clause of his policy requires. Because of the ease of airline transportation, he need not lose significantly more time than if the case were at home. Consequently, if the suit went for-

---

[5] In every *International Shoe* inquiry, the defendant, necessarily, is outside the forum State. Thus it is inevitable that either the defendant or the plaintiff will be inconvenienced. The problem existing at the time of *Pennoyer* v. *Neff*, 95 U. S. 714 (1878), that a resident plaintiff could obtain a binding judgment against an unsuspecting, distant defendant, has virtually disappeared in this age of instant communication and virtually instant travel.

[6] It is true that the insurance contract is not the subject of the litigation. *Post,* at 329. But one of the undisputed clauses of the insurance policy is that the insurer will defend this action and pay any damages assessed, up to the policy limit. The very purpose of the contract is to relieve the insured from having to defend himself, and under the state statute there could be no suit absent the insurance contract. Thus, in a real sense, the insurance contract is the source of the suit. See *Shaffer* v. *Heitner*, 433 U. S. 186, 207 (1977).

ward in Minnesota, the defendant would bear almost no burden or expense beyond what he would face if the suit were in his home State. The real impact on the named defendant is the same as it is in a direct action against the insurer, which would be constitutionally permissible. *Watson* v. *Employers Liability Assurance Corp.,* 348 U. S. 66 (1954); *Minichiello* v. *Rosenberg,* 410 F. 2d 106, 109–110 (CA2 1968). The only distinction is the formal, "analytica[1] prerequisite," *post,* at 331, of making the insured a named party. Surely the mere addition of appellant's name to the complaint does not suffice to create a due process violation.[7]

Finally, even were the relevant inquiry whether there are sufficient contacts between the forum and the named defendant, I would find that such contacts exist. The insurer's presence in Minnesota is an advantage to the defendant that may well have been a consideration in his selecting the policy he did. An insurer with offices in many States makes it easier for the insured to make claims or conduct other business that may become necessary while traveling. It is simply not true that "State Farm's decision to do business in Minnesota was completely adventitious as far as Rush was concerned." *Post,* at 328–329. By buying a State Farm policy, the defendant availed himself of the benefits he might derive from having an insurance agent in Minnesota who could, among other things, facilitate a suit for appellant against a Minnesota resident. It seems unreasonable to read the Constitution as permitting one to take advantage of his nationwide insurance network but not to be burdened by it.

In sum, I would hold that appellant is not deprived of due process by being required to submit to trial in Minnesota, first because Minnesota has a sufficient interest in and con-

---

[7] Were the defendant a real party subject to actual liability or were there significant noneconomic consequences such as those suggested by the Court's note 20, *post,* at 331, a more substantial connection with the forum State might well be constitutionally required.

nection to this litigation and to the real and nominal defendants, and second because the burden on the nominal defendant is sufficiently slight.

### B

In No. 78–1078, the interest of the forum State and its connection to the litigation is strong. The automobile accident underlying the litigation occurred in Oklahoma. The plaintiffs were hospitalized in Oklahoma when they brought suit. Essential witnesses and evidence were in Oklahoma. See *Shaffer* v. *Heitner,* 433 U. S., at 208. The State has a legitimate interest in enforcing its laws designed to keep its highway system safe, and the trial can proceed at least as efficiently in Oklahoma as anywhere else.

The petitioners are not unconnected with the forum. Although both sell automobiles within limited sales territories, each sold the automobile which in fact was driven to Oklahoma where it was involved in an accident.[8] It may be true, as the Court suggests, that each sincerely intended to limit its commercial impact to the limited territory, and that each intended to accept the benefits and protection of the laws only of those States within the territory. But obviously these were unrealistic hopes that cannot be treated as an automatic constitutional shield.[9]

---

[8] On the basis of this fact the state court inferred that the petitioners derived substantial revenue from goods used in Oklahoma. The inference is not without support. Certainly, were use of goods accepted as a relevant contact, a plaintiff would not need to have an exact count of the number of petitioners' cars that are used in Oklahoma.

[9] Moreover, imposing liability in this case would not so undermine certainty as to destroy an automobile dealer's ability to do business. According jurisdiction does not expand liability except in the marginal case where a plaintiff cannot afford to bring an action except in the plaintiff's own State. In addition, these petitioners are represented by insurance companies. They not only could, but did, purchase insurance to protect them should they stand trial and lose the case. The costs of the insurance no doubt are passed on to customers.

An automobile simply is not a stationary item or one designed to be used in one place. An automobile is *intended* to be moved around. Someone in the business of selling large numbers of automobiles can hardly plead ignorance of their mobility or pretend that the automobiles stay put after they are sold. It is not merely that a dealer in automobiles foresees that they will move. *Ante,* at 295. The dealer actually intends that the purchasers will use the automobiles to travel to distant States where the dealer does not directly "do business." The sale of an automobile does *purposefully* inject the vehicle into the stream of interstate commerce so that it can travel to distant States. See *Kulko,* 436 U. S., at 94; *Hanson* v. *Denckla,* 357 U. S. 235, 253 (1958).

This case is similar to *Ohio* v. *Wyandotte Chemicals Corp.,* 401 U. S. 493 (1971). There we indicated, in the course of denying leave to file an original-jurisdiction case, that corporations having no direct contact with Ohio could constitutionally be brought to trial in Ohio because they dumped pollutants into streams outside Ohio's limits which ultimately, through the action of the water, reached Lake Erie and affected Ohio. No corporate acts, only their consequences, occurred in Ohio. The stream of commerce is just as natural a force as a stream of water, and it was equally predictable that the cars petitioners released would reach distant States.[10]

The Court accepts that a State may exercise jurisdiction over a distributor which "serves" that State "indirectly" by "deliver[ing] its products into the stream of commerce with the expectation that they will be purchased by consumers in the forum State." *Ante,* at 297–298. It is difficult to see why the Constitution should distinguish between a case involving

---

[10] One might argue that it was more predictable that the pollutants would reach Ohio than that one of petitioners' cars would reach Oklahoma. The Court's analysis, however, excludes jurisdiction in a contiguous State such as Pennsylvania as surely as in more distant States such as Oklahoma.

goods which reach a distant State through a chain of distribution and a case involving goods which reach the same State because a consumer, using them as the dealer knew the customer would, took them there.[11] In each case the seller purposefully injects the goods into the stream of commerce and those goods predictably are used in the forum State.[12]

Furthermore, an automobile seller derives substantial benefits from States other than its own. A large part of the value of automobiles is the extensive, nationwide network of highways. Significant portions of that network have been constructed by and are maintained by the individual States, including Oklahoma. The States, through their highway programs, contribute in a very direct and important way to the value of petitioners' businesses. Additionally, a network of other related dealerships with their service departments operates throughout the country under the protection of the laws of the various States, including Oklahoma, and enhances the value of petitioners' businesses by facilitating their customers' traveling.

Thus, the Court errs in its conclusion, *ante,* at 299 (emphasis added), that "petitioners have *no* 'contacts, ties, or relations' " with Oklahoma. There obviously are contacts, and, given Oklahoma's connection to the litigation, the contacts are sufficiently significant to make it fair and reasonable for the petitioners to submit to Oklahoma's jurisdiction.

## III

It may be that affirmance of the judgments in these cases would approach the outer limits of *International Shoe*'s juris-

[11] For example, I cannot understand the constitutional distinction between selling an item in New Jersey and selling an item in New York expecting it to be used in New Jersey.

[12] The manufacturer in the case cited by the Court, *Gray* v. *American Radiator & Standard Sanitary Corp.,* 22 Ill. 2d 432, 176 N. E. 2d 761 (1961), had no more control over which States its goods would reach than did the petitioners in this case.

dictional principle. But that principle, with its almost exclusive focus on the rights of defendants, may be outdated. As MR. JUSTICE MARSHALL wrote in *Shaffer* v. *Heitner*, 433 U. S., at 212: " '[T]raditional notions of fair play and substantial justice' can be as readily offended by the perpetuation of ancient forms that are no longer justified as by the adoption of new procedures. . . ."

*International Shoe* inherited its defendant focus from *Pennoyer* v. *Neff*, 95 U. S. 714 (1878), and represented the last major step this Court has taken in the long process of liberalizing the doctrine of personal jurisdiction. Though its flexible approach represented a major advance, the structure of our society has changed in many significant ways since *International Shoe* was decided in 1945. Mr. Justice Black, writing for the Court in *McGee* v. *International Life Ins. Co.*, 355 U. S. 220, 222 (1957), recognized that "a trend is clearly discernible toward expanding the permissible scope of state jurisdiction over foreign corporations and other nonresidents." He explained the trend as follows:

> "In part this is attributable to the fundamental transformation of our national economy over the years. Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity." *Id.*, at 222–223.

As the Court acknowledges, *ante*, at 292–293, both the nationalization of commerce and the ease of transportation and communication have accelerated in the generation since 1957.[13]

---

[13] Statistics help illustrate the amazing expansion in mobility since *International Shoe*. The number of revenue passenger-miles flown on

The model of society on which the *International Shoe* Court based its opinion is no longer accurate. Business people, no matter how local their businesses, cannot assume that goods remain in the business' locality. Customers and goods can be anywhere else in the country usually in a matter of hours and always in a matter of a very few days.

In answering the question whether or not it is fair and reasonable to allow a particular forum to hold a trial binding on a particular defendant, the interests of the forum State and other parties loom large in today's world and surely are entitled to as much weight as are the interests of the defendant. The "orderly administration of the laws" provides a firm basis for according some protection to the interests of plaintiffs and States as well as of defendants.[14] Certainly, I cannot see how a defendant's right to due process is violated if the defendant suffers no inconvenience. See *ante,* at 294.

The conclusion I draw is that constitutional concepts of fairness no longer require the extreme concern for defendants that was once necessary. Rather, as I wrote in dissent from *Shaffer* v. *Heitner, supra,* at 220 (emphasis added), minimum

---

domestic and international flights increased by nearly three orders of magnitude between 1945 (450 million) and 1976 (179 billion). U. S. Department of Commerce, Historical Statistics of the United States, pt. 2, p. 770 (1975); U. S. Department of Commerce, Statistical Abstract of the United States 670 (1978). Automobile vehicle-miles (including passenger cars, buses, and trucks) driven in the United States increased by a relatively modest 500% during the same period, growing from 250 billion in 1945 to 1,409 billion in 1976. Historical Statistics, *supra,* at 718; Statistical Abstract, *supra,* at 647.

[14] The Court has recognized that there are cases where the interests of justice can turn the focus of the jurisdictional inquiry away from the contacts between a defendant and the forum State. For instance, the Court indicated that the requirement of contacts may be greatly relaxed (if indeed any personal contacts would be required) where a plaintiff is suing a nonresident defendant to enforce a judgment procured in another State. *Shaffer* v. *Heitner,* 433 U. S., at 210–211, nn. 36, 37.

contacts must exist "among the *parties*, the contested transaction, and the forum State." [15]   The contacts between any two of these should not be determinative.   "[W]hen a suitor seeks to lodge a suit in a State with a substantial interest in seeing its own law applied to the transaction in question, we could wisely act to minimize conflicts, confusion, and uncertainty by adopting a liberal view of jurisdiction, unless considerations of fairness or efficiency strongly point in the opposite direction." [16]   433 U. S., at 225–226.   Mr. Justice Black, dissenting in *Hanson* v. *Denckla*, 357 U. S., at 258–259, expressed similar concerns by suggesting that a State should have jurisdiction over a case growing out of a transaction significantly related to that State "unless litigation there would impose such a heavy and disproportionate burden on a nonresident defendant that it would offend what this Court has referred to as 'traditional notions of fair play and substantial justice.' " [17]   Assuming

[15] In some cases, the inquiry will resemble the inquiry commonly undertaken in determining which State's law to apply.  That it is fair to apply a State's law to a nonresident defendant is clearly relevant in determining whether it is fair to subject the defendant to jurisdiction in that State. *Shaffer* v. *Heitner, supra,* at 225 (BRENNAN, J., dissenting); *Hanson* v. *Denckla,* 357 U. S. 235, 258 (1958) (Black, J., dissenting).  See n. 19, *infra.*

[16] Such a standard need be no more uncertain than the Court's test "in which few answers will be written 'in black and white.  The greys are dominant and even among them the shades are innumerable.' *Estin* v. *Estin,* 334 U. S. 541, 545 (1948)." *Kulko* v. *California Superior Court,* 436 U. S. 84, 92 (1978).

[17] This strong emphasis on the State's interest is nothing new.  This Court, permitting the forum to exercise jurisdiction over nonresident claimants to a trust largely on the basis of the forum's interest in closing the trust, stated:

"[T]he interest of each state in providing means to close trusts that exist by the grace of its laws and are administered under the supervision of its courts is so insistent and rooted in custom as to establish beyond doubt the right of its courts to determine the interests of all claimants, resident or nonresident, provided its procedure accords full opportunity to appear

that a State gives a nonresident defendant adequate notice and opportunity to defend, I do not think the Due Process Clause is offended merely because the defendant has to board a plane to get to the site of the trial.

The Court's opinion in No. 78–1078 suggests that the defendant ought to be subject to a State's jurisdiction only if he has contacts with the State "such that he should reasonably anticipate being haled into court there." [18]  *Ante,* at 297. There is nothing unreasonable or unfair, however, about recognizing commercial reality. Given the tremendous mobility of goods and people, and the inability of businessmen to control where goods are taken by customers (or retailers), I do not think that the defendant should be in complete control of the geographical stretch of his amenability to suit. Jurisdiction is no longer premised on the notion that nonresident defendants have somehow impliedly consented to suit. People should understand that they are held responsible for the consequences of their actions and that in our society most actions have consequences affecting many States. When an action in fact causes injury in another State, the actor should be prepared to aswer for it there unless defending in that State would be unfair for some reason other than that a state boundary must be crossed.[19]

In effect the Court is allowing defendants to assert the sov-

---

and be heard." *Mullane* v. *Central Hanover Trust Co.,* 339 U. S. 306, 313 (1950).

[18] The Court suggests that this is the critical foreseeability rather than the likelihood that the product will go to the forum State. But the reasoning begs the question. A defendant cannot know if his actions will subject him to jurisdiction in another State until we have declared what the law of jurisdiction is.

[19] One consideration that might create some unfairness would be if the choice of forum also imposed on the defendant an unfavorable substantive law which the defendant could justly have assumed would not apply. See n. 15, *supra.*

ereign rights of their home States. The expressed fear is that otherwise all limits on personal jurisdiction would disappear. But the argument's premise is wrong. I would not abolish limits on jurisdiction or strip state boundaries of all significance, see *Hanson, supra,* at 260 (Black, J., dissenting); I would still require the plaintiff to demonstrate sufficient contacts among the parties, the forum, and the litigation to make the forum a reasonable State in which to hold the trial.[20]

I would also, however, strip the defendant of an unjustified veto power over certain very appropriate fora—a power the defendant justifiably enjoyed long ago when communication and travel over long distances were slow and unpredictable and when notions of state sovereignty were impractical and exaggerated. But I repeat that that is not today's world. If a plaintiff can show that his chosen forum State has a sufficient interest in the litigation (or sufficient contacts with the defendant), then the defendant who cannot show some real injury to a constitutionally protected interest, see *O'Connor* v. *Lee-Hy Paving Corp.,* 579 F. 2d, at 201, should have no constitutional excuse not to appear.[21]

The plaintiffs in each of these cases brought suit in a forum with which they had significant contacts and which had significant contacts with the litigation. I am not convinced that the defendants would suffer any "heavy and disproportionate burden" in defending the suits. Accordingly, I would hold

---

[20] For instance, in No. 78–952, if the plaintiff were not a bona fide resident of Minnesota when the suit was filed or if the defendant were subject to financial liability, I might well reach a different result. In No. 78–1078, I might reach a different result if the accident had not occurred in Oklahoma.

[21] Frequently, of course, the defendant will be able to influence the choice of forum through traditional doctrines, such as venue or *forum non conveniens,* permitting the transfer of litigation. *Shaffer* v. *Heitner,* 433 U. S., at 228, n. 8 (BRENNAN, J., dissenting).

that the Constitution should not shield the defendants from appearing and defending in the plaintiffs' chosen fora.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE BLACKMUN joins, dissenting.

For over 30 years the standard by which to measure the constitutionally permissible reach of state-court jurisdiction has been well established:

> "[D]ue process requires only that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *International Shoe Co.* v. *Washington,* 326 U. S. 310, 316 (1945), quoting *Milliken* v. *Meyer,* 311 U. S. 457, 463 (1940).

The corollary, that the Due Process Clause forbids the assertion of jurisdiction over a defendant "with which the state has no contacts, ties, or relations," 326 U. S., at 319, is equally clear. The concepts of fairness and substantial justice as applied to an evaluation of "the quality and nature of the [defendant's] activity," *ibid.,* are not readily susceptible of further definition, however, and it is not surprising that the constitutional standard is easier to state than to apply.

This is a difficult case, and reasonable minds may differ as to whether respondents have alleged a sufficient "relationship among the defendant[s], the forum, and the litigation," *Shaffer* v. *Heitner,* 433 U. S. 186, 204 (1977), to satisfy the requirements of *International Shoe.* I am concerned, however, that the majority has reached its result by taking an unnecessarily narrow view of petitioners' forum-related conduct. The majority asserts that "respondents seek to base jurisdiction on one, isolated occurrence and whatever inferences can be drawn therefrom: the fortuitous circumstance that a single Audi automobile, sold in New York to New York

residents, happened to suffer an accident while passing through Oklahoma." *Ante,* at 295. If that were the case, I would readily agree that the minimum contacts necessary to sustain jurisdiction are not present. But the basis for the assertion of jurisdiction is not the happenstance that an individual over whom petitioners had no control made a unilateral decision to take a chattel with him to a distant State. Rather, jurisdiction is premised on the deliberate and purposeful actions of the defendants themselves in choosing to become part of a nationwide, indeed a global, network for marketing and servicing automobiles.

Petitioners are sellers of a product whose utility derives from its mobility. The unique importance of the automobile in today's society, which is discussed in MR. JUSTICE BLACKMUN's dissenting opinion, *post,* at 318, needs no further elaboration. Petitioners know that their customers buy cars not only to make short trips, but also to travel long distances. In fact, the nationwide service network with which they are affiliated was designed to facilitate and encourage such travel. Seaway would be unlikely to sell many cars if authorized service were available only in Massena, N. Y. Moreover, local dealers normally derive a substantial portion of their revenues from their service operations and thereby obtain a further economic benefit from the opportunity to service cars which were sold in other States. It is apparent that petitioners have not attempted to minimize the chance that their activities will have effects in other States; on the contrary, they have chosen to do business in a way that increases that chance, because it is to their economic advantage to do so.

To be sure, petitioners could not know in advance that this particular automobile would be driven to Oklahoma. They must have anticipated, however, that a substantial portion of the cars they sold would travel out of New York. Seaway, a local dealer in the second most populous State, and World-

Wide, one of only seven regional Audi distributors in the entire country, see Brief for Respondents 2, would scarcely have been surprised to learn that a car sold by them had been driven in Oklahoma on Interstate 44, a heavily traveled transcontinental highway. In the case of the distributor, in particular, the probability that some of the cars it sells will be driven in every one of the contiguous States must amount to a virtual certainty. This knowledge should alert a reasonable businessman to the likelihood that a defect in the product might manifest itself in the forum State—not because of some unpredictable, aberrant, unilateral action by a single buyer, but in the normal course of the operation of the vehicles for their intended purpose.

It is misleading for the majority to characterize the argument in favor of jurisdiction as one of " 'foreseeability' alone." *Ante,* at 295. As economic entities petitioners reach out from New York, knowingly causing effects in other States and receiving economic advantage both from the ability to cause such effects themselves and from the activities of dealers and distributors in other States. While they did not receive revenue from making direct sales in Oklahoma, they intentionally became part of an interstate economic network, which included dealerships in Oklahoma, for pecuniary gain. In light of this purposeful conduct I do not believe it can be said that petitioners "had no reason to expect to be haled before a[n Oklahoma] court." *Shaffer* v. *Heitner, supra,* at 216; see *ante,* at 297, and *Kulko* v. *California Superior Court,* 436 U. S. 84, 97–98 (1978).

The majority apparently acknowledges that if a product is purchased in the forum State by a consumer, that State may assert jurisdiction over everyone in the chain of distribution. See *ante,* at 297–298. With this I agree. But I cannot agree that jurisdiction is necessarily lacking if the product enters the State not through the channels of distribution but in the course of its intended use by the consumer. We have recog-

nized the role played by the automobile in the expansion of our notions of personal jurisdiction. See *Shaffer* v. *Heitner, supra,* at 204; *Hess* v. *Pawloski,* 274 U. S. 352 (1927). Unlike most other chattels, which may find their way into States far from where they were purchased because their owner takes them there, the intended use of the automobile is precisely as a means of traveling from one place to another. In such a case, it is highly artificial to restrict the concept of the "stream of commerce" to the chain of distribution from the manufacturer to the ultimate consumer.

I sympathize with the majority's concern that persons ought to be able to structure their conduct so as not to be subject to suit in distant forums. But that may not always be possible. Some activities by their very nature may foreclose the option of conducting them in such a way as to avoid subjecting oneself to jurisdiction in multiple forums. This is by no means to say that all sellers of automobiles should be subject to suit everywhere; but a distributor of automobiles to a multistate market and a local automobile dealer who makes himself part of a nationwide network of dealerships can fairly expect that the cars they sell may cause injury in distant States and that they may be called on to defend a resulting lawsuit there.

In light of the quality and nature of petitioners' activity, the majority's reliance on *Kulko* v. *California Superior Court, supra,* is misplaced. *Kulko* involved the assertion of state-court jurisdiction over a nonresident individual in connection with an action to modify his child custody rights and support obligations. His only contact with the forum State was that he gave his minor child permission to live there with her mother. In holding that the exercise of jurisdiction violated the Due Process Clause, we emphasized that the cause of action as well as the defendant's actions in relation to the forum State arose *"not from the defendant's commercial transactions in interstate commerce,* but rather from his personal,

domestic relations," 436 U. S., at 97 (emphasis supplied), contrasting Kulko's actions with those of the insurance company in *McGee* v. *International Life Ins. Co.*, 355 U. S. 220 (1957), which were undertaken for commercial benefit.*

Manifestly, the "quality and nature" of commercial activity is different, for purposes of the *International Shoe* test, from actions from which a defendant obtains no economic advantage. Commercial activity is more likely to cause effects in a larger sphere, and the actor derives an economic benefit from the activity that makes it fair to require him to answer for his conduct where its effects are felt. The profits may be used to pay the costs of suit, and knowing that the activity is likely to have effects in other States the defendant can readily insure against the costs of those effects, thereby sparing himself much of the inconvenience of defending in a distant forum.

Of course, the Constitution forbids the exercise of jurisdiction if the defendant had no judicially cognizable contacts with the forum. But as the majority acknowledges, if such contacts are present the jurisdictional inquiry requires a balancing of various interests and policies. See *ante*, at 292; *Rush* v. *Savchuk, post*, at 332. I believe such contacts are to be found here and that, considering all of the interests and policies at stake, requiring petitioners to defend this action in Oklahoma is not beyond the bounds of the Constitution. Accordingly, I dissent.

MR. JUSTICE BLACKMUN, dissenting.

I confess that I am somewhat puzzled why the plaintiffs in this litigation are so insistent that the regional distributor and the retail dealer, the petitioners here, who handled the ill-fated Audi automobile involved in this litigation, be named defendants. It would appear that the manufacturer and the

---

*Similarly, I believe the Court in *Hanson* v. *Denckla*, 357 U. S. 235 (1958), was influenced by the fact that trust administration has traditionally been considered a peculiarly local activity.

importer, whose subjectability to Oklahoma jurisdiction is not challenged before this Court, ought not to be judgment-proof. It may, of course, ultimately amount to a contest between insurance companies that, once begun, is not easily brought to a termination. Having made this much of an observation, I pursue it no further.

For me, a critical factor in the disposition of the litigation is the nature of the instrumentality under consideration. It has been said that we are a nation on wheels. What we are concerned with here is the automobile and its peripatetic character. One need only examine our national network of interstate highways, or make an appearance on one of them, or observe the variety of license plates present not only on those highways but in any metropolitan area, to realize that any automobile is likely to wander far from its place of licensure or from its place of distribution and retail sale. Miles per gallon on the highway (as well as in the city) and mileage per tankful are familiar allegations in manufacturers' advertisements today. To expect that any new automobile will remain in the vicinity of its retail sale—like the 1914 electric car driven by the proverbial "little old lady"—is to blink at reality. The automobile is intended for distance as well as for transportation within a limited area.

It therefore seems to me not unreasonable—and certainly not unconstitutional and beyond the reach of the principles laid down in *International Shoe Co.* v. *Washington*, 326 U. S. 310 (1945), and its progeny—to uphold Oklahoma jurisdiction over this New York distributor and this New York dealer when the accident happened in Oklahoma. I see nothing more unfair for them than for the manufacturer and the importer. All are in the business of providing vehicles that spread out over the highways of our several States. It is not too much to anticipate at the time of distribution and at the time of retail sale that this Audi would be in Oklahoma. Moreover, in assessing "minimum contacts," foreseeable use in another State seems to me to be little different from foreseeable resale

in another State. Yet the Court declares this distinction determinative. *Ante,* at 297–299.

MR. JUSTICE BRENNAN points out in his dissent, *ante,* at 307, that an automobile dealer derives substantial benefits from States other than its own. The same is true of the regional distributor. Oklahoma does its best to provide safe roads. Its police investigate accidents. It regulates driving within the State. It provides aid to the victim and thereby, it is hoped, lessens damages. Accident reports are prepared and made available. All this contributes to and enhances the business of those engaged professionally in the distribution and sale of automobiles. All this also may benefit defendants in the very lawsuits over which the State asserts jurisdiction.

My position need not now take me beyond the automobile and the professional who does business by way of distributing and retailing automobiles. Cases concerning other instrumentalities will be dealt with as they arise and in their own contexts.

I would affirm the judgment of the Supreme Court of Oklahoma. Because the Court reverses that judgment, it will now be about parsing every variant in the myriad of motor vehicle fact situations that present themselves. Some will justify jurisdiction and others will not. All will depend on the "contact" that the Court sees fit to perceive in the individual case.