Argued and submitted January 14, reversed and remanded August 20, 2003

SHAMROCK BUILDING MATERIALS, INC.,
an Oregon corporation,
*Appellant,*

*v.*

OVERSEAS BUILDING SUPPLY, L.L.C.,
a Florida limited liability company,
*Respondent.*

0110-11075; A117553

76 P3d 127

Kim T. Buckley argued the cause for appellant. With him on the briefs was Esler, Stephens & Buckley.

Brian R. Talcott argued the cause for respondent. With him on the brief were James M. Hillas and Dunn Carney Allen Higgins & Tongue LLP.

Before Edmonds, Presiding Judge, and Kistler and Schuman, Judges.

KISTLER, J., pro tempore.

## KISTLER, J., pro tempore

Plaintiff Shamrock Building Materials, Inc., is an Oregon corporation with its principal place of business in Beaverton, Oregon. Defendant Overseas Building Supply, L.L.C. (Overseas), is a Florida limited liability corporation with its principal place of business in Winter Park, Florida. In 2001, Shamrock accepted an offer from Overseas to purchase 99,600 sheets of drywall over a period of 70 days. When the drywall allegedly proved defective, Shamrock filed a complaint against Overseas in Oregon. Overseas moved to dismiss Shamrock's complaint for lack of personal jurisdiction. The trial court granted the motion. On Shamrock's appeal, we reverse and remand.

For the purposes of this appeal, the relevant facts are not disputed. Overseas imports and sells drywall wholesale. Shamrock is a wholesale broker of building supplies. In 2000, Overseas telephoned Shamrock in Oregon. Overseas asked Shamrock if it could supply Overseas with drywall manufactured in the United States. Shamrock replied that it would be glad to do business with Overseas but that the domestic supply of drywall was very tight at that point. No agreement resulted from Overseas' initial contact.

In July 2001, Overseas contacted Shamrock in Oregon again. This time, Overseas faxed an offer to sell Shamrock 99,600 sheets of imported drywall for $76 per thousand square feet, F.O.B. Overseas' warehouse in Florida. The offer contemplated that Shamrock would purchase the drywall over a period of 70 days. Specifically, it required Shamrock to issue a purchase order for five truckloads of drywall at $81 per thousand square feet pending a rebate of $5 per thousand square feet if Shamrock prepaid $91,200 for the last 25,000 of the 99,600 sheets ordered. The offer also contemplated that Shamrock would issue purchase orders for the remainder of the drywall during the 70-day period and that Overseas would bill Shamrock periodically as it issued the purchase orders. If Shamrock did not issue purchase orders for all the drywall within the 70-day period, the offer required Shamrock to pay demurrage to Overseas based on

the amount of drywall remaining. Demurrage would be calculated every 10 days, and Overseas would bill Shamrock accordingly. Additionally, after the 70-day period passed, the price for the remaining sheets of drywall was subject to renegotiation.

Shamrock accepted Overseas' offer. According to the affidavit of Overseas' president, within the 70-day period,

> "Shamrock purchased and picked up 79,260 sheets of drywall (prior to the penalty portion of the Agreement) F.O.B. at the Overseas' warehouse in Brevard County, Florida. Shamrock itself, or through arrangements Shamrock made with others, then caused delivery of the drywall to various locations from the F.O.B. sale at Overseas' dock in Brevard County, Florida. On information and belief, the vast majority of the drywall which Shamrock purchased F.O.B. at Overseas' warehouse was delivered by Shamrock to locations in Florida, except for certain drywall delivered by, or at the direction of, Shamrock to a location in Georgia."[1]

As Shamrock issued purchase orders for the drywall, "[i]nvoices were faxed daily to [Shamrock in] Oregon for processing and payment."

The drywall that Overseas sold Shamrock allegedly proved defective. When Shamrock's customers began complaining about the drywall, Shamrock took back the drywall from the customers who rejected it and resold the drywall in an effort to mitigate its damages. It also filed a complaint for breach of contract against Overseas in Multnomah County Circuit Court. Overseas moved to dismiss the complaint for lack of personal jurisdiction. The trial court granted Overseas' motion and entered judgment against Shamrock, which has appealed from the judgment.[2]

On appeal, Shamrock argues that the trial court had jurisdiction over Overseas under ORCP 4 D, 4 E, and 4 L, the last of which authorizes a trial court to exercise personal

---

[1] According to the affidavit of Shamrock's president, it shipped the drywall to customers in other states.

[2] We review dismissals for lack of personal jurisdiction for errors of law. *Kotera v. Daioh Int'l U.S.A. Corp.*, 179 Or App 253, 262, 40 P3d 506 (2002). We construe pleadings and affidavits liberally in favor of jurisdiction and assume the truth of all well-pleaded allegations. *Id.*

jurisdiction over an out-of-state defendant to the extent permitted by the Due Process Clause. *See Sutherland v. Brennan*, 321 Or 520, 528-29, 901 P2d 240 (1995) (interpreting ORCP 4 L). Overseas responds that the trial court lacked jurisdiction under ORCP 4 D and 4 E but that, even if the terms of those rules were satisfied, the Due Process Clause was not. The issue, as the parties frame it on appeal, reduces to the question whether an Oregon court may, consistently with the Due Process Clause, exercise personal jurisdiction over Overseas.

The United States Supreme Court has long recognized that due process limits the power of a state court to exercise personal jurisdiction over an out-of-state defendant. *See Pennoyer v. Neff*, 95 US 714, 733-34, 24 L Ed 565 (1877). The basis for that conclusion has shifted from territorial limitations on process to limitations based on fairness and convenience to the parties involved. *International Shoe Co. v. Washington*, 326 US 310, 316, 66 S Ct 154, 90 L Ed 95 (1945) (explaining the shift from the rationale in *Pennoyer*). As the Court explained in *International Shoe*,

> "now that the *capias ad respondendum* has given way to personal service of summons or other form of notice, due process requires only that in order to subject a defendant to a judgment *in personam*, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' "

326 US at 316. The "criteria by which [a court] mark[s] the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical and quantitative." *Id.* at 319. Rather, "[w]hether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to ensure." *Id.*

Since *International Shoe*, the courts have sought to define more precisely the principle that the Court articulated in that case. As refined in later cases, the inquiry divides into two parts:

"First, the defendant must have 'minimum contacts' with the forum state. 'Minimum contacts' will be found where the defendant has 'purposefully directed' its activities at residents of the forum state *and* where the litigation 'arises out of or relates to' those activities. Second, even if minimum contacts exist, the exercise of jurisdiction must be reasonable; in the light of various factors deemed relevant by the Court, the exercise of jurisdiction must comport with 'fair play and substantial justice.' "

*State ex rel Circus Circus Reno, Inc. v. Pope,* 317 Or 151, 159-60, 854 P2d 461 (1993) (emphasis in original).

The first part of the inquiry—whether a defendant purposefully has directed or availed itself of the privileges of conducting activities within the forum state—"ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts." *Burger King Corp. v. Rudzewicz,* 471 US 462, 475, 105 S Ct 2174, 85 L Ed 2d 528 (1985). The Court accordingly explained in *Burger King*:

"[A]n individual's contract with an out-of-state party *alone* can[not] automatically establish sufficient minimum contacts in the other party's home forum * * *. The Court long ago rejected the notion that personal jurisdiction might turn on 'mechanical' tests, or on 'conceptualistic ... theories of the place of contracting or of performance'. Instead, we have emphasized the need for a 'highly realistic' approach that recognizes that a 'contract' is 'ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction. It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts within the forum."

471 US at 478-79 (citations omitted; emphasis in original).

Considering the factors that the Court identified in *Burger King*, we hold that Overseas had sufficient minimum contacts with Oregon to permit the trial court to exercise personal jurisdiction over it. Overseas initiated its relationship with Shamrock by contacting Shamrock in Oregon, first in an

effort to buy domestic drywall and later in an effort to sell imported drywall. More significantly, the latter offer contemplated that, if Shamrock agreed to buy imported drywall from Overseas, the parties would enter, at a minimum, into a 70-day relationship during which time Shamrock would issue periodic purchase orders for drywall and Overseas would bill Shamrock in Oregon as it received those orders. As Overseas' president stated in his affidavit, during that period of time, Overseas faxed invoices "daily to Oregon for processing and payment."

To be sure, Overseas did not ship the allegedly defective drywall to Oregon. Rather, Overseas delivered the drywall to Shamrock in Florida, which then shipped the drywall to its customers in Florida and other states. But, as the Court explained in *Burger King*, personal jurisdiction does not necessarily turn on "conceptualistic theories of the place of contracting or of performance." 471 US at 478. Here, there was an ongoing business relationship between Overseas in Florida and Shamrock in Oregon, Overseas was faxing invoices daily to Oregon for payment, and the consequences of Overseas' alleged breach of contract were felt directly by Shamrock in Oregon. *See id.* at 480 (finding jurisdiction in Florida because, among other things, the out-of-state defendant's breach of contract "caused foreseeable [economic] injuries to the corporation in Florida"). Overseas' contacts with Oregon are not " 'random,' 'fortuitous,' or 'attenuated.' " *Id.* at 475; *see Sutherland*, 321 Or at 531. Rather, Overseas' ongoing business relationship with Shamrock was " 'such that [it] should reasonably [have] anticipate[d] being haled into court [h]ere' " to answer Shamrock's breach of contract claim. *Id.* at 474 (quoting *World-Wide Volkswagen Corp. v. Woodson*, 444 US 286, 297, 100 S Ct 559, 62 L Ed 2d 490 (1980). Sufficient minimum contacts existed.

Shamrock's breach of contract claim arises out of Overseas' contacts with Oregon, *see State ex rel Circus Circus Reno, Inc.*, 317 Or at 160-61, and the only remaining question is whether exercising jurisdiction would be consistent with notions of "fair play and substantial justice." On that point, we note that the Court explained in *Burger King Corp.* that "[a] State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries

inflicted by out-of-state actors." 471 US at 473. It also explained that, where individuals purposefully derive benefits from interstate activities, as Overseas did here, "it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities[.]" *Id.* at 474. Finally, the Court reasoned that, given the changes in "modern transportation and communications," "it usually will not be unfair to subject [an out-of-state defendant] to the burdens of litigating in another forum for disputes relating to such activity." *Id.* All those considerations support exercising jurisdiction over Overseas. Although Overseas argues that Florida is the more convenient forum because the allegedly defective drywall can be found in that state and nearby states, that consideration is not enough to persuade us that it would be inconsistent with the Due Process Clause for an Oregon court to require Overseas to answer Shamrock's breach of contract claim. Because the trial court had personal jurisdiction over Overseas under ORCP 4 L, we reverse its judgment and remand for further proceedings.

Reversed and remanded.