**CORSICA LIVESTOCK SALES, INC., a corporation, Plaintiff,**

v.

**The SUMITOMO BANK OF CALIFORNIA, Defendant.**

Civ. No. 79–4060.

United States District Court, D. South Dakota, S. D.

April 7, 1980.

Gale E. Fisher, Sioux Falls, S. D., for plaintiff.

David V. Vrooman, Sioux Falls, S. D., for defendant.

## MEMORANDUM DECISION

NICHOL, Chief Judge.

Defendant has moved to dismiss this action on the grounds that its contacts with the State of South Dakota are insufficient to justify the exercise of *in personam* jurisdiction. Plaintiff moved for leave to file an amended complaint. The court granted plaintiff's motion. Both parties have submitted affidavits in support of their respective positions. The motion will therefore be treated as one for summary judgment.

The amended complaint alleges the following: In March of 1979, two individuals, neither of whom are parties to this suit, opened a corporate checking account with Sumitomo Bank. The account, in the name of General Services Corporation (GSC), was opened at Sumitomo's Santa Monica, California branch office with an initial deposit of $57,000. The two individuals signed signature cards at this time. They explained to representatives of Sumitomo that they would be making large purchases of cattle in South Dakota; to this end they inquired about the possibility of obtaining a $1,500,000 line of credit with Sumitomo. In response to this inquiry Sumitomo's representatives initiated an investigation of GSC's proposed activities. On March 28, 1979, Thomas Reding, an Assistant Vice President and Assistant Manager of Sumitomo's Santa Monica branch, traveled to South Dakota to personally investigate the cattle buying and selling operation in Corsica, South Dakota.

The amended complaint further alleges that while in South Dakota, Reding visited plaintiff's premises at Corsica. Reding observed plaintiff's operation and talked to various officers and stockholders of Corsica

Livestock Marketing, Inc., (CLM),[1] and GSC. Reding learned that CLM would be purchasing cattle at plaintiff's facility. GSC would provide funds for these purchases. As soon as the cattle were re-sold by CLM the proceeds were to be deposited at and wired through the Hurley State Bank in Hurley, South Dakota, to Sumitomo for credit to GSC's account. Ronald Wentland, an employee of CLM, would handle these monetary transactions. To this end Wentland executed one of Sumitomo's signature cards as an authorized drawer on the GSC account. A few days after Reding's trip to South Dakota, Sumitomo denied GSC's request for a line of credit. GSC continued to maintain an account with Sumitomo. Several drafts, in payment of livestock purchases in South Dakota, were honored by Sumitomo. Some of these checks were signed by Wentland.

On April 10, 1979, plaintiff received a check from GSC in the amount of $117,379.04, drawn on the account with Sumitomo. This check was delivered to First Mitchell National Bank, Mitchell, South Dakota. First Mitchell presented the check to Sumitomo on about April 13, 1979. Sufficient funds were not on deposit at this time to cover the check. The check was therefore held by Sumitomo. On April 17, 1979, Hurley State Bank wired $300,000 to Sumitomo for credit to GSC's account. On April 18, 1979, GSC closed out its account; a Cashier's Check in the amount of $307,648.02 was issued to GSC by Sumitomo. Sumitomo then returned the $117,379.04 check unpaid. GSC has, of course, evanesced.

The plaintiff approaches this suit with several theories. First, that by retaining the check beyond its midnight deadline without taking any actions, Sumitomo became accountable for the amount of the check. Second, that Sumitomo was negligent in its handling of the presented check and allowing the GSC account to be closed without paying the presented check. Third,

that the statements and representations made to plaintiff by Sumitomo's representatives were calculated to, and in fact did, lead plaintiff to believe that GSC would have a $1,500,000 line of credit with Sumitomo; plaintiff's reliance on these alleged representations inducing it to accept GSC's check drawn on Sumitomo. Finally, that Sumitomo actively conspired with GSC in establishing a course of conduct and performance reasonably calculated to lead the plaintiff to believe that GSC had adequate financing, which was false and untrue.

Sumitomo has submitted affidavits in support of its motion to dismiss. Sumitomo is a California banking corporation, doing business within the state of California. Sumitomo has no offices in South Dakota and does not transact business on a regular basis within South Dakota. In fact, for all the record shows, the occurrences involved in this case may well be Sumitomo's only experience with South Dakota.

Thomas Reding's affidavit states that he journeyed to South Dakota at the request and expense of GSC. The sole purpose of this journey was to verify that the livestock operation in Corsica existed and was operated in the nature represented by GSC. Reding was not given authority to negotiate terms of any loan. Reding maintains that the trip did not involve the checking account and that the account was not discussed with anyone while he was in South Dakota. He further stated that all he did was observe an auction at the plaintiff's facility and discussed the auction with principals from CLM.

Plaintiff submitted an opposing affidavit from two of the officers of CLM. This affidavit disputes Reding's claim not to have discussed either the line of credit or the checking account. It further states that Wentland signed a signature card in the presence of themselves and Reding.

Sumitomo subsequently filed an additional affidavit by Reding stating that he did not take a signature card to South Dakota

---

1. For the purposes of this motion CLM is an entity separate and distinct from plaintiff Corsica Livestock Sales, Inc.

and that the records of Sumitomo do not contain a signature card authorizing Wentland to sign for GSC.

Plaintiff answered this affidavit with one by Wentland. Wentland states that he signed the signature card at the meeting between Reding and the principals of CLM. Wentland further states that he signed several checks. One check, bearing only his signature, a copy of which was attached to his affidavit, was paid by Sumitomo. Three others were returned due to insufficient funds and one was co-signed by individuals associated with GSC; only the check that is the subject of this suit being returned with Sumitomo claiming his signature was not authorized.

We are left with a factual dispute over the extent of Mr. Reding's activities on his one day trip to South Dakota. In considering a motion for summary judgment any disputed issue of material fact must, of course, be resolved in favor of the party against which the motion is made.

■ Service was made in this diversity suit pursuant to the South Dakota long-arm statute, SDCL 15–7–2. This statute has been construed by the South Dakota Supreme Court as conferring jurisdiction to the "fullest extent permissible under the due process clause of the Fourteenth Amendment." *Ventling v. Kraft*, 83 S.D. 465, 161 N.W.2d 29, 30 (1968). Due process requires that a defendant "have certain minimum contacts with (the forum State) such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Kulko v. Superior Court*, 436 U.S. 84, 92, 98 S.Ct. 1690, 1697, 56 L.Ed.2d 132 (1978). The Supreme Court has recognized that the "minimum contacts" test is a weighing process ". . . in which few answers will be written 'in black and white. The grays are dominant and even among them the shades are innumerable.'" *Kulko, supra*, 436 U.S. at 92, 98 S.Ct. at 1697. The more slight the contact between the defendants and the forum state the stronger and more direct must be the relationship between the cause of action and the contacts with the forum state. *Cf.,*

*McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), and *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). It is not enough that a defendant might have foreseen that his actions conceivably could cause an injury within a particular state. Rather, the "foreseeability" that is critical to due process analysis is "that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen v. Woodson*, —— U.S. ——, ——, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980).

Plaintiff's first two theories may well not be sufficient to support the assertion of *in personam* jurisdiction. At best they are an assertion of an "effect" within the State of South Dakota. The alleged actions by Sumitomo that give rise to these two causes of action took place solely within the State of California. And, on the whole, it seems doubtful that they are of such a nature that Sumitomo should have reasonably anticipated being haled to South Dakota to account for them.

The last two theories, however, present a different situation. Although the answer is certainly not written in black or white, the shade of gray in which they are clothed seems to pass constitutional muster. Taking the allegations and affidavits advanced by plaintiff as true, Sumitomo committed purposeful acts within the State of South Dakota, while seeking commercial benefit, that led to an injury. Unlike the first two, these causes of action are intertwined with Sumitomo's single contact with South Dakota.

■ The motion of the defendant therefore should be denied. The foregoing are to comprise the court's findings of fact and conclusions of law.