**CARTER OIL COMPANY, INC.,**
**Plaintiff,**

v.

**APEX TOWING COMPANY, a**
**Corporation, Defendant.**

**No. LR–C–81–77.**

United States District Court,
E. D. Arkansas, W. D.

Dec. 21, 1981.

Judson C. Kidd, John Wesley Hall, Jr., Little Rock, Ark., for plaintiff.

H. William Allen, Allen, Cabe & Lester, Little Rock, Ark., and Richard Dempsey, St. Louis, Mo., for defendant.

## MEMORANDUM OPINION

ROY, District Judge.

Pending before the Court is defendant Apex Towing Company's motion to dismiss the complaint for lack of personal jurisdiction. A hearing was held at which testimony was presented on the issue of jurisdiction; thereafter, the parties were afforded the opportunity to supplement the record, if desired, with additional depositions, affidavits and certified maps of the Mississippi River. Post-hearing briefs, an additional affidavit, and certified maps have been submitted and the matter is now ready for decision.

The instant lawsuit arose from the charter of two river barges between plaintiff Carter Oil Company of Benton, Arkansas, owner of the barges, and one Thomas Marine Company of Pennsylvania. Barge C–201 was chartered to Thomas Marine on March 19, 1973; barge C–202 was chartered on April 10, 1973. Each charter was for a term of five years, at the end of which period the barges were returned in an alleged state of disrepair for which damages under the charter agreement are sought.

The record indicates that the following intervening transactions occurred during the course of the two five-year charters: on January 28, 1977, Thomas Marine Company subchartered the barges to one Binion Marine Service of Houston, Texas, for the remainder of the charter terms. (The charters ended on March 19, 1978, for C–201 and on April 10, 1978, for C–202.) On February 28, 1977, Apex Oil Company acquired 100 percent of the outstanding common stock of Thomas Marine Company, a Pennsylvania corporation. Thereafter, the corporate name was changed from Thomas Marine Company to Apex Towing Company and it remained a Pennsylvania corporation. In September 1980 (after the charter periods had terminated), Apex Towing Company became a division of another Apex Oil Company subsidiary, namely, Apex R. E. & T., Inc., a Delaware corporation.

Mr. Robert P. Girard, the secretary of Apex R. E. & T., testified that he had been the secretary-treasurer of Thomas Marine Company up until the time of the takeover by Apex Oil Company. Thus, he was the custodian of the records for both companies throughout the five-year charter period. It was his testimony that during the time in question the barges operated by both companies, including barges C–201 and C–202, were used on the inland waterways of the United States for the transportation of petroleum. The primary routes taken were Houston-Chicago, Houston-Pittsburgh, Houston-Chattanooga, and Houston-St. Louis, all via the Mississippi River. Other departure points used were Port Arthur, Lake Charles, and Baton Rouge. During the year that C–201 and C–202 were subchartered to Binion Marine Service, they traveled solely on the intercoastal waterways between Houston and New Orleans. At no time were either of the barges used on the Arkansas River or on any other river located wholly within the State of Arkansas, with the exception of the Mississippi River itself. The maps which were furnished to the Court after the hearing indicate that at several points along the course of the Mississippi River, Arkansas land is on both of its banks. Thus, it appears that it is not possible for a vessel to travel from, for example, New Orleans to St. Louis without passing through the State of Arkansas.

The record at the hearing shows that prior to and during the charter period, Apex Towing Company had no office or employees in Arkansas, owned no property here, and transported no commodities between local points within the state. Beginning in September 1980, however, Apex has been using barges on the Arkansas River and has been transacting business in Arkansas since that time.

■ The question before the Court is whether Apex Towing Company had sufficient contacts with the State of Arkansas so as to render it subject to jurisdiction here for a lawsuit concerning damages to barges C–201 and C–202 occurring during the 1973–1978 charter period. A threshold question which must first be resolved is whether Apex may be held accountable for the activities of Thomas Marine prior to the February 1977 takeover. At the hearing, Mr. Girard stated that when Apex Oil Company (which owns 100 percent of the stock of defendant Apex Towing Company) acquired Thomas Marine, it assumed all of the obligations and duties under the latter's charter agreements with Carter Oil Company. Consequently, the Court finds that the acts of Thomas Marine should be attributed to Apex Towing for the purposes of the motion to dismiss. See, also, Ark.Stat.Ann. § 64–705 (Repl.1980).

■ A second question which must initially be considered is whether Apex Towing Company's present transaction of business within the State of Arkansas, which did not begin until September 1980, renders it subject to this Court's jurisdiction in a suit arising from activities which occurred prior to 1980. The plaintiff contends that the Arkansas Supreme Court has permitted actions to be brought in Arkansas against foreign corporations doing business in the state, even though the cause of action did not arise from the corporation's activities here, citing *Yockey v. St. Louis & S. F. Ry. Co.*, 183 Ark. 601, 37 S.W.2d 694 (1931), and *N.Y. Fire and Marine Underwriters, Inc., v. Colvin*, 241 Ark. 1019, 411 S.W.2d 657 (1967). In both of these cases, however, the defendants were already transacting business in Arkansas prior to the time when the cause of action arose, and consequently these cases are inapposite. Furthermore, it is well settled in the Eastern District of Arkansas that,

"In order to sustain jurisdiction under the Arkansas [Long-Arm] Statute, the plaintiff must show not only that the defendant transacted business in Arkansas but also that his cause of action is one 'arising out of' the transaction of business in this State by the defendant.

"In other words, there must be a relationship between the defendant's connection with Arkansas, here the transaction of business, and the injury complained of." *Krone v. A.M.I., Inc.*, 367 F.Supp. 1141 (E.D.Ark.1973).

See, also, *Martin v. Kelley Electric Co.*, 371 F.Supp. 1225 (E.D.Ark.1974), in which the defendant, Morgan Manufacturing Co., a South Dakota corporation, sold products to Arkansas purchasers "from time to time" and shipped products into Arkansas. Morgan was not qualified to do business here and had no local agent for service. The plaintiff was injured while using a Morgan product in Missouri. The Court held that Arkansas did not have long-arm jurisdiction in that due process was not satisfied because the plaintiff's claim was unrelated to any of Morgan's activities in Arkansas.

In view of the foregoing, the Court finds that the transaction of business in Arkansas by Apex from 1980 to the present time is not a factor which may properly be considered in deciding whether *in personam* jurisdiction exists in the instant cause of action, which involves Apex's activities prior to 1980. The question remaining then is whether Apex, and Thomas Marine before it, had sufficient contacts with the State of Arkansas during the 1973–1978 charter period so as to give this Court jurisdiction.

Beginning with *International Shoe Co. v. Washington*, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the former concepts of requiring a defendant's "presence" and "consent" were rejected in favor of the requisite of "certain minimum contacts" with the forum state such that maintenance of a suit does not offend "traditional notions of fair play and substantial justice." 326 U.S. at 316, 66 S.Ct. at 158. The Supreme Court noted that the demands of due process are met "by such contacts of the corporation with the state of the forum as make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought there." *Id.* at 317, 66 S.Ct. at 158.

This trend was continued in *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957), in which the Court found that only one contact, having a substantial connection with the state, was sufficient for due process purposes. Later, however, in *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), the Court also noted that not all restrictions to the exercise of *in personam* jurisdiction over foreign corporations had been removed. The *Hanson* opinion reiterated that a minimal burden to establish jurisdiction is that "there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." 357 U.S. at 253, 78 S.Ct. at 1239. The mere "unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State." *Id.* at 253, 78 S.Ct. at 1239.

The Supreme Court has most recently discussed the boundaries of a state's long-arm jurisdiction in *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). This was an Oklahoma products liability suit which arose from an automobile accident in that state involving an Audi which had been purchased by the plaintiffs in New York while they were residents there. At the time of the accident the plaintiffs were merely passing through Oklahoma on their way from New York to Arizona. The defendants, the automobile retailer and its wholesaler, were New York corporations who carried on no activity in Oklahoma, closed no sales and performed no services there, availed themselves of none of the benefits of Oklahoma law, and solicited no business there either through salespersons or through advertising reasonably calculated to reach Oklahoma.

The Court noted that the limits imposed upon state jurisdiction by the Due Process Clause, in its role as a guarantor against inconvenient litigation, have been substantially relaxed over the years, which trend is largely attributable to a fundamental transformation in the American economy. Quoting from *McGee v. International Life Ins. Co., supra*, at 222–223, 78 S.Ct. at 200–01, the Court stated that,

"Today many commercial transactions touch two or more States and may involve parties separated by the full continent. With this increasing nationalization of commerce has come a great increase in the amount of business conducted by mail across state lines. At the same time modern transportation and communication have made it much less burdensome for a party sued to defend himself in a State where he engages in economic activity."

The Court then stated that the historical developments noted in *McGee* have naturally only accelerated in the generation since that case was decided. Nevertheless, the Court refused to accept the proposition that state lines are irrelevant for jurisdictional purposes, and held that the mere fortuitous happening of an accident in a state where the defendants did no business whatsoever did not constitute sufficient grounds upon which to base jurisdiction. The plaintiffs' argument that jurisdiction should lie because the defendants could have reasonably foreseen that an accident involving one of its automobiles would occur in Oklahoma was rejected, the Court holding that "foreseeability alone has never been a sufficient benchmark for personal jurisdiction under the Due Process Clause." 100 S.Ct. at 566. The Court went on to explain, however, that,

"This is not to say, of course, that foreseeability is wholly irrelevant. But the foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State. Rather, it is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there. [Citations omitted.]" 100 S.Ct. at 567.

■ In the instant case, although a very close question is presented, the Court finds that it cannot properly exercise jurisdiction

over the defendant. The evidence at the hearing showed that sometime in mid-1972 Ike Carter, president of Carter Oil Company, purchased barges C–201 and C–202 from the Martin Oil Company of Chicago. Around December 1972 or January 1973 Mr. Carter hired Robert J. Ross of Greenville, Mississippi, a marine surveyor and broker, to act as his agent in procuring a suitable lessee for C–201 and C–202. Having learned "through the grapevine" that Thomas Marine Company was in the market for some additional barges, Ross contacted the company president, Franklin P. Thomas III, discussed the barges with him, and referred him to Mr. Carter. In the following couple of months, Messrs. Thomas and Carter negotiated the charters of the barges. During the period of negotiation the barges were moved between several different locations, to wit, Houston, New Orleans, Baton Rouge, and Greenville. The inspection and survey of the barges by agents of the defendant took place in New Orleans.

The only person-to-person meetings which occurred during the course of the negotiations between Mr. Carter and Mr. Thomas or other agents of the defendant were held in New Orleans. Other negotiations were done over the telephone while Mr. Carter was either in New Orleans or at his office in Benton, Arkansas, and while Mr. Thomas was in either Pennsylvania, Florida, or New York.

The only written correspondence introduced at the hearing (defendant's Exhibits A–I) was between Mr. Thomas in Pennsylvania and Mr. Alexander Dann in Memphis, Tennessee, who was Carter's attorney, and between Thomas and the Union Planters National Bank in Memphis, to which Carter had assigned his rights to payment under the charter agreement: As evidenced by these exhibits, Dann sent a copy of each charter to Thomas, who would then execute it and return it to Dann in Memphis, who, in turn, would send it to Carter in Arkansas for his signature. In July 1973 Union Planters notified Thomas of the assignment, and in August 1973 Thomas began to send its monthly payments to Memphis to

the bank. Although the testimony was unclear as to where Thomas sent the monthly payments during the intervening four or five months prior to the assignment, it is presumed that such payments would have been made directly to the plaintiff in Benton, Arkansas. There was positive testimony that the final payment was made directly to Carter.

During the five-year term of the charters, the barges never entered Arkansas except as they traveled along the Mississippi River and passed "through" Arkansas at the various points where, due to the changing course of the river over the years, there is Arkansas land on the eastern riverbank. Although Archer Island, the fleeting area at the Greenville harbor, is actually part of Arkansas, there was no positive proof that either vessel was docked there at any time during the term of the charters. Neither the delivery nor redelivery of the barges was to be made in Arkansas; under the charter agreements, delivery was to be made in New Orleans, and redelivery was to be in New Orleans or "such other point mutually agreed upon."

Neither Apex, nor Thomas Marine before it, had any offices, agents or property within the State of Arkansas during the period in question. At no time did any representative of the defendant come to Arkansas for any reason connected with C–201 and C–202. Under the charter agreements neither party was required to perform any services or to provide any goods within Arkansas. On the contrary, the only things to be provided, to wit, the barges, were to be delivered by the plaintiff to the defendant outside of Arkansas. The only person-to-person dealings between the parties occurred outside of Arkansas, with all other oral communication being by telephone, some conversations occurring while Mr. Carter was in Arkansas and some while both he and Thomas were out of the state. The only evidence of written correspondence was from outside of Arkansas.

■ Under these circumstances the Court finds that the defendant's contacts with

Arkansas were insufficient and that consequently the due process standards for long-arm jurisdiction enunciated in the cases cited hereinabove have not been met. Five factors have been held to warrant consideration in cases construing the Uniform Long Arm Act, to wit, (1) the quantity of the contacts within the forum state; (2) the nature and quality of the contacts; (3) the source and connection of the cause of action with those contacts; (4) the interest of the forum state; and (5) the convenience of the parties. *Thompson v. Ecological Science Corp.,* 421 F.2d 467 (1970); *Aftanase v. Economy Baler Co.,* 343 F.2d 187 (8th Cir. 1965).

Here the first three criteria simply are not adequately satisfied. The acts which occurred within Arkansas appear to have been unilateral activities on the part of the plaintiff and were not activities initiated by the defendant; there was no showing that the defendant performed any act within Arkansas by which it "purposefully availed itself of the privilege of conducting activities" here, thus "invoking the benefits and protections" of Arkansas laws. *Hanson v. Denckla, supra,* at 253, 78 S.Ct. at 1239. The fact that the barges passed through Arkansas as they traveled up and down the Mississippi River was, in the Court's opinion, merely a fortuitous act which did not involve any purpose on the part of the defendant to avail itself of the privilege to conduct business in Arkansas. See *Hutson v. Fehr Bros., Inc.,* 584 F.2d 833 (8th Cir. 1979). In *Chandler v. G. W. Gladder Towing Co.,* 143 F.Supp. 568 (E.D.Ark.1956), the Court dismissed a complaint involving a Mississippi River towboat which had docked for loading and refueling at the Arkansas City, Arkansas, port on numerous occasions. As in the present case, the defendant had no office or place of business in Arkansas, had not qualified to do business here, had appointed no agent for service, transported no commodities between local points within Arkansas, and owned no property in Arkansas. The plaintiff contended that the boat's entry into the Arkansas City port constituted "doing business" in Arkansas pursuant to the provisions of Ark.Stat.Ann. § 27–

340. The Court, however, held that the activities carried out by the defendant in Arkansas were purely interstate in nature, and dismissed the case for lack of jurisdiction. See, also, *Fitzsimmons v. Jones Towing, Inc.,* 238 F.Supp. 92 (N.D.Ala.1965), which cited the *Chandler* case, and which similarly held that a barge merely passing through Alabama on the Tennessee River was insufficient to sustain jurisdiction. Granted, *Chandler* and *Fitzsimmons* dealt with service statutes which required that a defendant "do business" within a state, as opposed to the long-arm statute's requirement of "transacting any business," the latter of which is a less stringent standard. The Court finds, however, that the same rationale is applicable in the instant case.

With respect to the latter two criteria noted in *Thompson v. Ecological Science Corp., supra,* which are secondary to the first three,

> "Even if the defendant would suffer minimal or no inconvenience from being forced to litigate before the tribunals of another State; even if the forum State has a strong interest in applying its law to the controversy; even if the forum State is the most convenient location for litigation, the Due Process Clause, acting as an instrument of interstate federalism, may sometimes act to divest the State of its power to render a valid judgment." *World-Wide Volkswagen Corp. v. Woodson, supra,* 100 S.Ct. at 565.

See, also, *Roger N. Joyce & Assoc., Inc., v. Paoli Steel Corp.,* 491 F.Supp. 1095 (E.D. Ark.1980).

In sum, the Court finds that the record in this case shows insufficient contacts with Arkansas by the defendant so as to "make it reasonable, in the context of our federal system of government, to require the corporation to defend the particular suit which is brought here." *International Shoe Co. v. Washington, supra,* at 317, 66 S.Ct. at 158; *Thompson v. Ecological Science Corp., supra,* at 469. The plaintiff has failed to meet its minimal burden of establishing that "there be some act by which the defendant purposefully avails itself of the

privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla, supra,* at 253, 78 S.Ct. at 1239.

Wherefore, the defendant's motion to dismiss is hereby granted.