620 A.2d 1154

**COMMONWEALTH CAPITAL FUNDING, INC.**

**v.**

**FRANKLIN SQUARE HOSPITAL, Appellant.**

Superior Court of Pennsylvania.

Argued Jan. 7, 1993.

Filed Feb. 19, 1993.

150

Richard M. Beck, Philadelphia, for appellant.

Daniel S. Bernheim, III, Philadelphia, for appellee.

Before CIRILLO, BECK and KELLY, JJ.

CIRILLO, Judge:

This is an appeal from an order of the Court of Common Pleas of Philadelphia County denying Appellant Franklin Square Hospital's (FSH) petition to strike/vacate or open foreign judgment. We affirm.

Great Western Funding, Inc. (Great Western) is a Texas corporation doing business in Texas.[1] Great Western and the Hampton Hospital Group (HHG), as the agent for FSH, entered into a joint venture which permitted investors to acquire, through Great Western, FSH receivables. Intended investors would purchase the receivables and in return receive their initial investment and a profit on the factored accounts, once sums owed to FSH were collected.

Appellee Commonwealth Capital Funding, Inc. (Capital) is a Texas corporation doing business in Texas. Capital was solicited by Great Western for the purpose of investment of factoring accounts receivable of FSH. Capital tendered $194,-000.00 to FSH and received FSH receivables from Great Western. Capital never realized any of its alleged investment due on the receivables or a refund of its initial investment of $194,000.00.

Capital brought suit against FSH in Tarrant County, Texas. Pursuant to the Texas long-arm statute, Texas Civil Practice & Remedies Code § 17.042 (Vernon 1986), FSH was served with notice of the suit. FSH failed to appear or file an answer to Capital's complaint. Capital obtained a default judgment in the amount of $200,644.26, which included Capital's original investment and approximately $6,000.00 of prejudgment interest. FSH received notice of the judgment but failed to appeal

1. Great Western is in the business of purchasing hospital receivables and, through its investors, providing hospitals with immediate cash flow.

or move to set aside the judgment. Judgment was entered and Capital then transferred the judgment to Pennsylvania pursuant to the Uniform Enforcement of Foreign Judgments Act, 42 Pa.C.S.A. § 4306 (1981) (the Act).

FSH filed a petition to strike/vacate or open the foreign judgment contending that it had insufficient contacts with the Texas forum and that the exercise of personal jurisdiction over FSH was contrary to Texas law.[2] Following voluminous discovery between the parties, the trial court denied FSH's petition. This timely appeal followed. Instantly, we must determine whether FSH's activities in the Texas forum were sufficient to permit the Texas forum to assert personal jurisdiction over it. An affirmative answer to this question also resolves the issue of whether the trial court erred in enforcing the foreign judgment pursuant to section 4306 of the Act.

The constitutional mandate that each state give full faith and credit to judgments transferred from sister states[3] is codified under the Act. The Act's provisions permit a simplistic and systematic transfer of money judgments from one state's court to another. *See Tandy Computer Leasing v.*

2. In its brief, FSH erroneously labels the question presented as whether the trial court erred in refusing to strike or open the foreign judgment. The Act only provides that a judgment may be reopened, vacated or stayed. 42 Pa.C.S.A. § 4306(b). Because a foreign judgment entered without jurisdiction is a nullity, thus void, it must be vacated and not opened, because to do otherwise would be to permit the trial court to proceed further in an action against a defendant over whom personal jurisdiction had not been obtained. *Holden v. Holden,* 374 Pa.Super. 184, 542 A.2d 557 (1988) (en banc) (plurality), *allocatur denied,* 520 Pa. 617, 554 A.2d 509 (1988) (Cirillo, P.J., concurring, with three judges joining concurrence). Likewise, a judgment may only be stricken when there appears a defect on the face of the record. *Bittenbender v. SEPTA,* 362 Pa.Super. 243, 523 A.2d 1173 (1987), *allocatur denied,* 517 Pa. 602, 536 A.2d 1327 (1987). Here, although FSH improperly captioned its petition, the trial court refused to strike or open the judgment. We, therefore, find no technical error regarding the propriety of the trial court's order.

3. U.S. Const. art. IV, § 1 provides in relevant part:
Full Faith and Credit shall be given in each State to the public Acts, Records, and Judicial Proceedings of every other State.
Art. IV, § 1.

*DeMarco,* 388 Pa.Super. 128, 564 A.2d 1299 (1989). In order for our courts to recognize the judgment as valid and enforceable, the sister state must have had proper jurisdiction over the defendant and afforded him or her due process of law. Instantly, a lack of personal jurisdiction over FSH or a lack of due process protection on the part of the Texas court would require that full faith and credit be denied and the judgment vacated. *Everson v. Everson,* 264 Pa.Super. 563, 400 A.2d 887 (1979), *aff'd and order modified on oth. grds.* 494 Pa. 348, 431 A.2d 889 (1981). Conversely, a transferred judgment may not be denied full faith and credit merely because a defendant has a valid defense to the action if it had been brought in Pennsylvania or because the judgment violates the policy or law of the forum where enforcement is sought. *Everson, supra; Greate Bay Hotel v. Saltzman,* 415 Pa.Super. 408, 609 A.2d 817 (1992).

 While FSH's arguments based on the lack of personal jurisdiction fall within the accepted parameters for a court to deny a foreign judgment full faith and credit, we find the facts presented here establish the necessary minimum contacts under Texas law for the Texas court to assert jurisdiction over FSH.[4]

 Where the forum state seeks to assert specific jurisdiction over a non-resident, as in the instant case, the due process clause of the fourteenth amendment of the United States Constitution is satisfied if the non-resident has "purposely directed" his or her activities at residents of the forum and the litigation arose out of those activities. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472, 105 S.Ct. 2174, 2181, 85 L.Ed.2d 528 (1985) (citations omitted). The question of whether the defendant has purposely directed his activities at residents of the forum is not whether or not it was foreseeable that the defendant's activities would be injurious in the forum, but whether the defendant's contacts with the forum state

4. Both parties concede that although the question of personal jurisdiction over FSH in Texas is to be decided by a Pennsylvania court, we apply Texas law. *Bartholomew Associates, Inc. v. Townhome, Inc.,* 270 Pa.Super. 95, 410 A.2d 1266 (1979).

were such that he could reasonably anticipate being "haled" into court there. *Id.* at 474, 105 S.Ct. at 2183 (citation omitted). The question of whether FSH could reasonably have anticipated being "haled" into Texas court must be resolved by examining FSH's contacts with the forum state. *Id.* (citation omitted).

The long-arm statute of Texas provides that service of process may be made on a non-resident who is "doing business" in Texas. § 17.042. A non-resident is defined as "doing business" in Texas if the non-resident enters into a contract with a Texas resident and either party is to perform any or all of the contract in Texas. *Id.* The statute's broad language of "doing business" has been construed to reach to the limits of the due process clause of the fourteenth amendment of the federal constitution in permitting Texas courts to assert personal jurisdiction over non-residents. *Schlobohm v. Schapiro,* 784 S.W.2d 355 (Tex.1990); *see Helicopteros Nacionales de Colombia v. Hall,* 466 U.S. 408, 413, 104 S.Ct. 1868, 1871, 80 L.Ed.2d 404 (1984) (citation omitted).

■ FSH was served pursuant to the long-arm statute and does not argue its amenability to service of process. However, FSH correctly maintains that its entering into a contract with a Texas resident, while in and of itself sufficient to permit service, is not conclusive of jurisdiction. *Burger King, supra; Computer Synergy Corp. v. Business Systems Products, Inc.,* 582 S.W.2d 573 (Tex.Civ.App.1979). Accordingly, the Texas courts have held that once it is determined that a non-resident is "doing business" for purposes of service, the reach of the long-arm statute for purposes of jurisdiction must be guided under a due process analysis of "minimum contacts" and the "traditional notions of fair play and substantial justice." *Siskind v. Villa Foundation for Education, Inc.,* 624 S.W.2d 803 (Tex.Ct.App.1981), *aff'd in part, rev'd in part on oth. grds.,* 642 S.W.2d 434 (Tex.1982); *U–Anchor Advertising, Inc. v. Burt,* 553 S.W.2d 760 (Tex.1977), *cert. denied,* 434 U.S. 1063, 98 S.Ct. 1235, 55 L.Ed.2d 763 (1978); *see Helicopteros,* 466 U.S. at 413 n. 7, 104 S.Ct. at 1871 n. 7.

The due process clause limits the power of a state to assert its jurisdiction over a non-resident defendant. *Helicopteros*, 466 U.S. at 413–14, 104 S.Ct. at 1871–72 (citation omitted). Jurisdiction over a non-resident is permissible when there exists "certain minimum contacts" between the defendant, the forum state, and the litigation. *Id.* at 414, 104 S.Ct. at 1872 (citations omitted). The minimum contacts analysis is not susceptible to any inflexible, unyielding or mechanical test or formula, rather the facts of each case must be balanced in determining whether jurisdiction is proper. *Burger King*, 471 U.S. at 478, 105 S.Ct. at 2185 (citation omitted). Random, fortuitous, or attenuated contacts between the forum and a defendant will not support the exercise of personal jurisdiction. *Id.* at 475, 105 S.Ct. at 2183 (citations omitted). Jurisdiction is only proper where the contacts with the forum state proximately result from actions of the defendant, himself, which serve to create a "substantial connection" with the forum state. *Id.* at 475, 105 S.Ct. at 2183 (citation omitted). Even a single act may be sufficient to confer jurisdiction in a forum. *McGee v. International Life Ins. Co.*, 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957). Once the court decides that a non-resident has purposely established minimum contacts with the forum state, the court must next consider whether an assertion of jurisdiction by the forum comports with "fair play and substantial justice." *Burger King*, 471 U.S. at 476, 105 S.Ct. at 2184 (citation omitted). Factors to be considered in making this determination are:

the burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of the several States in furthering fundamental substantive social policies.

*Id.* at 477, 105 S.Ct. at 2184 (citing *World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292, 100 S.Ct. 559, 564, 62 L.Ed.2d 490 (1980)). Review of the law of Texas evidences a faithful adherence by the Texas courts to jurisdictional mandates of the Supreme Court recounted above. *See Helicopte-*

*ros,* 466 U.S. at 413 n. 7, 104 S.Ct. at 1871 n. 7. The Texas Supreme Court in *O'Brien v. Lanpar Company,* 399 S.W.2d 340 (Tex.1966) put forth the test of personal jurisdiction as follows:

> (1) The nonresident defendant or foreign corporation must purposefully do some act or consummate some transaction in the forum state;
>
> (2) the cause of action must arise from, or be connected with, such act or transaction; and
>
> (3) the assumption of jurisdiction by the forum state must not offend traditional notions of fair play and substantial justice, consideration being given to the quality, nature, and extent of the activity in the forum state, the relative convenience of the parties, the benefits and protection of the laws of the forum state afforded the respective parties, and the basic equities of the situation.

*Id.* at 342 (citing *International Shoe Co. v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945)).

While the fact that FSH entered into a contract with a resident of Texas is not, in and of itself, determinative that FSH purposely availed itself to the Texas forum, we find that the activities surrounding the execution of the contract are sufficient to establish minimum contacts with the forum.

> If the question is whether an individual's contract with an out-of-state party *alone* can automatically establish sufficient minimum contacts in the other party's home forum, we believe the answer clearly is that it cannot. . . . Instead, we have emphasized the need for a "highly realistic" approach that recognizes that a "contract" is "ordinarily but an intermediate step serving to tie up prior business negotiations with future consequences which themselves are the real object of the business transaction." . . . It is these factors—prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum.

*Burger King,* 471 U.S. at 478–79, 105 S.Ct. at 2185 (citations omitted) (emphasis in original). This analysis, known as the "contract-plus" rule was adopted by the Texas Supreme Court in *Zac Smith & Co. v. Otis Elevator Company, Inc.,* 734 S.W.2d 662 (Tex.1987), *cert. denied,* 484 U.S. 1063, 108 S.Ct. 1022, 98 L.Ed.2d 986 (1988). In finding the existence of personal jurisdiction over the defendant the court there stated:

> In a case such as the one before us, where the foreign defendant has had a single or few contacts with the forum by virtue of a contract, [i]t is those two factors—*prior negotiations and contemplated future consequences,* along with the terms of the contract and the parties' actual course of dealing—that must be evaluated in determining whether the defendant purposefully established minimum contacts with the forum.

*Id.* at 665 (citation omitted) (emphasis added).

Instantly, the trial court found that FSH's contacts with the Texas forum were such that FSH should have reasonably anticipated being haled into court there, that FSH purposely availed itself of the privilege of conducting business within the forum state and the benefits and protections of the forum state's laws. The trial court concluded, therefore, that jurisdiction over FSH was fair and just.[5] *Hanson v. Denckla,* 357

5. We note that the parties have presented numerous decisions by the Texas courts regarding jurisdiction over a non-resident that have similarities with the instant case. As we noted above, Texas law controls the ultimate question of jurisdiction. *Bartholomew, supra.* However, as we also stated, there is no hard and fast "talismatic jurisdictional formula" and the facts of each case must be weighed in determining whether jurisdiction is proper. *Burger King, supra.*

We note that while the federal circuit courts' interpretation of Texas law is persuasive in its analysis, we are not bound by this precedent.

We are also cognizant of FSH's argument concerning the choice of law provision in the contract. Such a provision is not determinative of personal jurisdiction.

> ... choice-of-law *analysis*—which focuses on all elements of a transaction, and not simply on the defendant's conduct—is distinct from minimum contacts jurisdictional analysis—which focuses at the threshold solely on the defendant's purposeful connection to the forum. ... such a provision standing alone would be insufficient to confer jurisdiction. ...

U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *World–Wide,* *supra; Burger King, supra; International Shoe, supra.* Upon review of the parties' briefs, the record and Texas case law, we find no error on the part of the trial court in enforcing the judgment as Texas properly asserted personal jurisdiction over FSH.

FSH conducted numerous activities in the state of Texas. In November, 1990 FSH sent a representative, Dr. Edward Silverman, (Silverman) to Texas for the purpose of finding a purchaser of account receivables on a factoring basis. Silverman met with representatives from Great Western for the sole purpose of ascertaining whether Great Western would purchase the accounts to assist in raising capital for FSH. At the time of Silverman's visit FSH was known as Metropolitan Hospital (Hospital) and was seeking protection from its creditors under Chapter 11 bankruptcy. Hospital was under a management agreement with HHG. HHG was owned by Silverman. This relationship served as the catalyst for Silverman's solicitation of investment capital in FSH's behalf.

Numerous and extensive negotiations followed. Silverman supplied voluminous financial documents which evidenced FSH's financial status and future projections as well. Financial statements were also sent. More meetings between the parties took place at FSH in Philadelphia and representatives of Great Western reviewed FSH's portfolio of receivables. Silverman then presented the option of a joint venture between the parties and executed a Letter of Intent whereby Great Western would fund HHG's acquisition of Hospital's assets. This would allow Hospital to emerge post-bankruptcy as a new non-profit entity under the name FSH.

The parties also executed documents which intended that Great Western would manage and receive a percentage of the accounts receivable that were processed and funded. FSH was to provide with every batch of receivables a written report describing the accounts and FSH was further required to tender to Great Western all money received for sold receiva-

Burger King, 471 U.S. at 481–82, 105 S.Ct. at 2187 (citation omitted) (emphasis in original).

bles and to report on all receipts taken in by FSH. It was also agreed that Great Western and HHG were to set up an additional entity to fund FSH's future operation on an ongoing basis. The purchase and sales agreement further provided that Great Western would purchase the FSH receivables in the form of chattel paper and that Great Western would receive a security interest in the paper. These agreements also provided that Great Western be permitted to assign its rights of purchasing receivables to various investors who in return for capital would factor and purchase the receivables.

During negotiations and following execution of the documents the parties were in constant contact with each other by both telephone and fax, and Great Western monitored and verified all accounts and collections. At least one special bank account was set up in the name of "Hampton Hospital Group Great Western Funding Joint Venture" and a series of wire transfers between Texas and Pennsylvania were made. Similarly, numerous transfers of funds between Philadelphia banks and Texas also occurred. In all, several million dollars was transferred between 1990 and the commencement of the instant litigation. The vast majority of these funds were invested by Texas entities.

Following its assignment of receivables from Great Western and after wiring the funds to FSH, Capital made numerous attempts to obtain information regarding its forthcoming receivables and confirmation that a UCC financing statement had been filed. While awaiting verification from FSH, it was discovered by both Capital and Great Western that FSH had granted a security interest in its receivables to another lender to the exclusion of Great Western. After receiving no response, Capital filed the instant suit.

On the basis of these facts, we conclude that FSH had purposefully established numerous contacts with the Texas forum, both before and after the execution of the contract, such that an assertion of jurisdiction over FSH comports with due process, "fair play and substantial justice." *Burger King, supra.* The record as developed in the trial court reveals not merely a single contract between a non-resident and a Texas

resident, but a contract that established the intent to continue an ongoing business relationship with Great Western and numerous other Texas entities as investors. Chattel paper was sold into the stream of commerce for its sole entry into the Texas forum. The contract did not call for one sale under the contract but numerous and continuing sales on a regular basis.

As a result of the solicitation by Silverman and the transactions that followed between the parties, Great Western, Capital and other investors were induced to purchase millions of dollars of receivables. These funds were systematically and frequently transferred between Pennsylvania and Texas and vice versa. Various agreements were executed between Great Western and FSH in which Great Western would purchase as well as manage FSH's receivables relying only upon local Texas investors. This joint venture permitted FSH's predecessor to emerge from bankruptcy with a substantial cash flow and future stability as well.

We find that FSH clearly and purposely availed itself of the privilege of conducting business within the forum state and the benefits and protections of the forum state's laws. *Hanson, supra.* FSH's contacts with the Texas forum were such that FSH should have reasonably anticipated being haled into court there. *Burger King, supra.* As such, under the instant facts, jurisdiction over FSH was fair and just. *World–Wide, supra; Burger King, supra; International Shoe, supra.* Accordingly, we agree with the trial court that FSH's activities were sufficient to establish those minimum contacts necessary for FSH to be subject to the personal jurisdiction of the Texas forum.

Order affirmed.