**FABRY GLOVE AND MITTEN CO., Plaintiff,**

v.

**A. Robert SPITZER, M.D. and Grandoe Corporation, Defendants.**

**No. 95–C–376.**

United States District Court,
E.D. Wisconsin.

Nov. 7, 1995.

---

Michael Bowen, Foley & Lardner, Milwaukee, WI, for Plaintiff.

Ross A. Anderson, Whyte, Hirschboeck & Dudek, S.C., Milwaukee, WI, Milton Springut, Lieberman & Nowak, LLP, New York, NY, for Grandoe.

Robert Horowitz, Stafford, Rosenbaum, Rieser & Hansen, Madison, WI, Cindy Rhodes Victor, MacDonald & Goren, PC, Birmingham, MI, for Spitzer.

Joseph Neterval, Centro Legal, Milwaukee, WI, for Singh.

William Lipscomb, Assistant U.S. Attorney, United States Attorney's Office, Milwaukee, WI, for Swan.

## DECISION AND ORDER

CALLAHAN, United States Magistrate Judge.

### Background

This is a commercial case in which plaintiff Fabry Glove and Mitten Co., ("Fabry") has sued A. Robert Spitzer, M.D., ("Spitzer") and Grandoe Corporation ("Grandoe"). Jurisdiction of the Court is invoked pursuant to the provisions of 28 U.S.C. § 1331 by virtue of the fact that there is diversity of citizenship and the amount in controversy exceeds $50,-000.

According to the allegations of the Complaint, which, at this stage of the proceedings, I must accept as true, *McCroan v. Bailey,* 543 F.Supp. 1201 (S.D.Ga.1982), Fabry is a Wisconsin corporation, with its principal place of business located in Green Bay, Wisconsin. Spitzer is a physician residing in West Bloomfield, Michigan. Grandoe is a New York corporation operating out of Gloversville, New York.

Fabry's claims against Spitzer and Grandoe arise out of a certain document identified by Fabry as "an interim licensing and royalty agreement[,]" (Complaint, ¶ 8), a copy of which is attached to the Complaint as Exhibit 1. Fabry refers to this interim licensing and royalty agreement as "the Fabry license," and, for purposes of this Decision and Order I will refer to it as "the Fabry license" as well. The Fabry license was executed by John J. Fabry, president of Fabry, and by Spitzer, on May 1, 1994.

According to the plaintiff's allegations, Fabry is in the business of, among other things, designing, manufacturing and distributing a substantial line of gloves for use by people engaging in sports and physical activity. It is also the holder of a patent (the "Fabry Patent"), covering gloves using a palm pad to prevent the development of a physical condition known as carpal tunnel syndrome. (Complaint, ¶ 5).

Spitzer has designed a palm pad for use on gloves to prevent development of carpal tunnel syndrome. Spitzer's glove, incorporating Spitzer's palm pad, is covered by a separate patent (i.e., the "Spitzer Patent"). According to the plaintiff, Fabry and Spitzer had worked together for approximately four years to develop, improve, and arrange for the manufacture and marketing of palm pad gloves within the scope of both the Fabry and Spitzer Patents. (Complaint, ¶¶ 5, 7).

Also, according to the plaintiff, Fabry and Spitzer had engaged in extensive negotiations over a formal licensing and royalty agreement. Fabry alleges that the Fabry license was intended by Fabry and Spitzer to govern the activities of these two parties until such time as "a more elaborate agreement could be worked out." (Complaint, ¶ 8). For purposes of clarity, the text of the Fabry license will be set out in full. It reads:

To Whom It May Concern:

This document confirms a business relationship by and between Dr. Robert Spitzer (hereafter "Spitzer") and Fabry Glove and Mitten Company, through its SARANAC Glove Division, (hereafter "SARANAC"), whereby "SARANAC" has developed a series of gloves which incorporate a cushion pad, a subject of United States Letters Patent 5,031,640 and Serial No. 440,644 filed November 22, 1989, entitles "Pad For Preventing Carpal Tunnel Syndrome" (hereafter "The Pad"), the right, title and interest is owned by "Spitzer". In consideration for exclusive rights in the USA and territories, for use of "The Pad", "SARANAC" shall pay to "Spitzer" a royalty fee of seven percent (7%) on net sales of products which incorporate "The Pad" sold directly to retailers or five percent (5%) of net sales of products which incorporate "The Pad" and are sold to wholesalers.

"SARANAC" agrees to furnish "Spitzer" with written reports within thirty (30) days after the first of January, April, July and October of each calendar year setting forth the number and net selling prices of products sold and the royalties due thereon. The terms and conditions as set forth above shall be effective as of January 1, 1994 and shall continue until a formal "Exclusive License Agreement" is mutually adopted by "Spitzer" and "SARANAC", which shall be no later than August 1, 1994.

( [I]t is understood that this is a temporary agreement) [.]

Accepted By:

/s/ *A. Robert Spitzer, M.D.*

Dr. Robert Spitzer

Fabry Glove And Mitten Co.

DBA SARANAC Glove Company

By /s/ *John J. Fabry*

John J. Fabry, President

Attest

/s/ *5–1–94*

Date

Drafted this 5th day

of April, 1994 at

Green Bay, Wisconsin

The language of the Fabry license states that the terms of that agreement were to continue until a "formal exclusive license agreement" was mutually adopted by Spitzer and Fabry through its SARANAC glove division. This was to be accomplished no later than August 1, 1994. That "formal 'exclusive license agreement' " however, was never entered into, although several drafts of the licensing agreement had been discussed by Fabry and Spitzer. Nevertheless, *according* to the plaintiff's Complaint, subsequent to August 4, 1994, Fabry continued to fulfill all of its obligations under the Fabry license, and Dr. Spitzer continued to accept, receive and retain benefits flowing to him under and pursuant to the Fabry license, including without limitation substantial royalty payments. (Complaint, ¶ 9). On or about April 3, 1995, Spitzer, while at Fabry's headquarters in Green Bay, Wisconsin, advised Fabry that he had entered into a licensing agreement with Grandoe, purporting to grant Grandoe an exclusive license to manufacture and sell gloves covered by the Spitzer patent to the cycling industry and a non-exclusive license to sell such gloves to other market segments. (Complaint, ¶ 11).

Fabry, believing that it had been wronged by Spitzer, filed this lawsuit. It asserts three claims against Spitzer. The first claim is for breach of contract; the second claim is for intentional misrepresentation; and, the third claim is for violation of Wisconsin's Fair Dealership Law. Fabry named Grandoe as a defendant, claiming Grandoe to be a necessary party under Rule 19(a)(1) and (2), Fed. R.Civ.P. Fabry seeks injunctive relief against both defendants, and monetary relief against Spitzer.

## Analysis

Pending before this Court is Spitzer's Rule 12(b)(2) Motion to Dismiss the Complaint against him. He claims this Court lacks personal jurisdiction over him. The plaintiff opposes Spitzer's motion.

In addition to the briefs filed by Fabry and Spitzer in support of their respective positions on this motion, affidavits of Dr. Spitzer and of Lawrence Vanness (on behalf of Fabry) have been filed. The affidavits reveal that there are certain matters which are in dispute. However, the affidavits also reveal that there are certain matters not in dispute. In any event, because the Court will be deciding Spitzer's motion solely on the basis of written materials, Fabry need only show a **prima facia** case for personal jurisdiction. Moreover, Fabry is:

> entitled not only to the acceptance of all undenied factual assertions in [its] submissions, but also to the resolution in [its] favor of all disputes about relevant facts.

*Neiman v. Rudolf, Wolff and Co., Ltd.,* 619 F.2d 1189, 1190 (7th Cir.1980); *Wisconsin Electrical Manufacturing Co. v. Pennant Products, Inc.,* 619 F.2d 676 (7th Cir.1980). With that background, I will now turn to the relevant facts.

Sometime prior to 1992, Spitzer contacted companies,[1] including Fabry, about entering into a licensing agreement for use of his design of a glove component which would assist in the prevention of carpal tunnel syndrome. When he first contacted Fabry, Fabry was not interested. (Spitzer Aff., ¶¶ 2 and 3). However, in 1992, Fabry contacted Spitzer about his design. Fabry and Spitzer then discussed entering into a licensing agreement for his design. Fabry and Spitzer began negotiations for this licensing agreement in early 1993. The negotiations were conducted by telephone, facsimile transmission and mail. (Spitzer Aff., ¶ 4).

In addition to conducting negotiations by telephone, fax and mail, Spitzer personally visited Fabry in Green Bay sometime prior to March 1993. Although it is not clear from

---

1. The record does not reveal the number of companies contacted, nor their location.

the record precisely when that visit occurred, a fax was received by Fabry on March 22, 1993, which recounted what had transpired during that earlier visit. That fax reads as follows:

### 22 March 1993

Larry [2]: Last time I was in Green Bay, you cut up some gloves and we made one hand (only) of a new prototype. This incorporated some slight changes to the size and the position of the groove. As many of people have tried on the older prototypes, I am now even more sure the changes we made were slight but very necessary.

Please use that new prototype as the model for the new prototypes you are sending me tomorrow (today) and the first production batches.

Regards.

Bob Spitzer

Thereafter, in June 1993, Spitzer again visited Fabry in Green Bay. On the occasion of his June 1993 visit, he was at the company for approximately a day and a half. While there, he met with Lawrence Vanness and with a lead person at one of Fabry's Green Bay manufacturing facilities to discuss placement of the groove in the palm pad of the glove he had designed. (Vanness Aff., ¶ 4). Spitzer combined this visit to Fabry with his family's summer vacation in Door County, Wisconsin. (Spitzer Aff., ¶ 6).

In July, 1994, Spitzer again visited Fabry in Green Bay. Once again, he combined this visit with his family's summer vacation in Door County, Wisconsin. (Spitzer Aff., ¶ 9). He arrived at the company on a Thursday and stayed until Friday evening. During the course of that visit, he met with Lawrence Vanness for approximately one-half hour. He also met for varying periods of time with John Fabry, the company's chief executive officer, as well as with representatives of the company's marketing department. (Vanness Aff., ¶ 5).

According to Spitzer, his discussions with representatives of Fabry in June 1993 and July 1994 focused primarily on (1) the defects [he] had found when Fabry manufactured gloves supposedly according to his design and, (2) possible marketing ideas for nationally-distributed catalogs. (Spitzer Aff., ¶ 6). According to Vanness, during the course of the face-to-face meetings in Green Bay in June 1993 and in July 1994, topics which were discussed included the specific construction of gloves covered by Spitzer's patents. There was also hands-on examination of particular gloves or glove fragments during the course of discussions with manufacturing personnel. (Vanness Aff., ¶ 7).

From 1992 through the spring of 1995, Spitzer would contact Fabry by fax, by phone or by mail on an average of three times per week, except when he was on vacation. (Vanness Aff., ¶ 8). During the first week of April 1995, Spitzer was contacted by John Fabry, who demanded that Spitzer come to Green Bay to discuss with Fabry representatives the terms of the potential licensing agreement. Spitzer traveled to Green Bay, met with Fabry's representatives, including John Fabry and, during the course of that meeting, advised them that "there would be no business relationship because their tactics had made a licensing agreement impossible." (Spitzer Aff., ¶ 9).

Spitzer did receive two royalty checks from Fabry, which were mailed to him at Spitzer's address in West Bloomfield, Michigan. (Spitzer Aff., ¶ 12).

### A. Wisconsin Long–Arm Statute

The plaintiff, as noted above, has alleged three causes of action: breach of contract, intentional misrepresentation, and violation of the Wisconsin Fair Dealership Law (Wis. Stats.Chap. 135). Consequently, various provisions of Wisconsin's long-arm statute are applicable, depending upon which cause of action one is examining. Wis.Stats. §§ 801.05(5)(a), (b) and (c), would be applicable to the breach of contract and dealership causes of action. Wis.Stats. §§ 801.05(3) and (4) would be arguably applicable to the misrepresentation (i.e., tort) cause of action.

Examination of the Wisconsin long-arm statute is necessary because a federal court sitting in diversity, as is the case here, begins its personal jurisdiction analysis by determining whether the applicable state

---

**2.** The "Larry" referred to in the fax is Lawrence Vanness. (Vanness Aff., Ex. A).

long-arm statute confers personal jurisdiction over the defendant. *Federated Rural Electric Insurance Corp. v. Inland Power and Light,* 18 F.3d 389, 391 (7th Cir.1994). In that connection, the Wisconsin Supreme Court has determined that Wisconsin's long-arm statute is to be liberally construed in favor of the exercise of jurisdiction. *Federated Rural Electric Insurance Corp., Id.* Indeed, unlike the long-arm statute of some states, the Wisconsin long-arm statute is intended to reach to the fullest extent allowed under the due process clause. *Daniel J. Hartwig Associates, Inc. v. Kanner,* 913 F.2d 1213, 1217 (7th Cir.1990).

The provision of the Wisconsin long-arm statute which is applicable to contract causes of action provides, in pertinent part, that personal jurisdiction is proper in any action which:

> (a) Arises out of a promise made anywhere to the plaintiff or to some 3rd party for the plaintiff's benefit, by the defendant to perform services within this state or to pay for services to be performed in this state by the plaintiff; or

> (b) Arises out of services actually performed for the plaintiff by the defendant within this state, or services actually performed for the defendant by the plaintiff within this state if such performance within this state was authorized or ratified by the defendant; or

> (c) Arises out of a promise, made anywhere to the plaintiff or to some 3rd party for the plaintiff's benefit, by the defendant to deliver or receive within this state or to ship from this state goods, documents of title, or other things of value ...

Wis.Stats. §§ 801.05(5)(a), (b) and (c).

■ Furthermore, in Wisconsin, the following minimum contacts must exist before a defendant is subject to jurisdiction under the contract provision:

> (1) A claim arising out of the bargaining arrangement made with the defendant or on behalf of the plaintiff;

> (2) A promise or other act of the defendant made or performed anywhere, which evidences the bargaining agreement sued upon; and,

> (3) a showing that the arrangement itself involves or contemplates some substantial connection with the state.

*Capitol Fixture and Woodworking Group v. Woodma Distributors, Inc.,* 147 Wis.2d 157, 161–62, 432 N.W.2d 647, 650 (Ct.App.1988); *See also,* Foster, Rev.Notes to Wis.Stats. § 801.05(5) (1959).

■ I find that each of these minimum contacts exist for the purpose of application of the Wisconsin long-arm statute in this case.

The first cause of action is one alleging breach of contract. Without passing upon the merits of the claim, (as I am not required to do at this stage of the proceedings), it is clear that the plaintiff has alleged that it has sustained damage as a consequence of the defendant having breached the Fabry license (Complaint, Ex. 1) or, in the alternative, having breached a contract with congruent terms established by the course of dealing and by implication of law from and after August 1, 1994. (*See,* Complaint, ¶ 12). Furthermore, the Fabry license constitutes, at least for the limited purpose presented by this Motion, a promise of Spitzer evidencing the bargaining agreement sued upon.

Whether the third minimum contact exists, (i.e., a showing that the arrangement itself involves or contemplates some substantial connection with the state), requires a bit more examination. I do find, however, that there is sufficient factual basis to conclude that the arrangement itself involved or contemplated some substantial connection with the state.

To meet this third element, the "substantial connection" requirement, I must be persuaded that a defendant must have contemplated that at least "some" services would occur in Wisconsin. *See, Hartwig,* 913 F.2d 1213, 1217. Based on the factual record presented at this stage of the proceedings, it is clear that Spitzer must have contemplated that some services would be performed by Fabry in the state of Wisconsin. After all, as Spitzer was no doubt aware, Fabry's headquarters were located in Green Bay, Wisconsin, and its only manufacturing facilities were located in Green Bay and in Marinette, Wisconsin. (Vanness Aff., ¶ 2). Spitzer traveled to Wisconsin, met with Fabry personnel at Fabry's facilities in Green Bay, Wisconsin,

worked in conjunction with Vanness in cutting up some gloves and "[making] one hand only of a new prototype," (Vanness Aff., Ex. A), met with a lead person at one of Fabry's Green Bay manufacturing facilities to discuss placement of the groove in the palm pad of the glove that he had designed (Vanness Aff., ¶ 4), met with John Fabry, the company's chief executive officer, and met with representatives of Fabry's marketing department. This was done, quite clearly, in an effort to make sure that "the pad" that Spitzer had designed was appropriately incorporated into the products to be manufactured by Fabry.

The Fabry license clearly states that, in consideration for exclusive rights in the United States and territories for use of the "the pad," Fabry, or more properly its SARA-NAC division, would pay to Spitzer a royalty fee of seven percent (7%) on net sales of products which incorporate "the pad" sold directly to retailers, or five percent (5%) of net sales which incorporate "the pad" and are sold to wholesalers. Once again, Spitzer must have contemplated that at least "some" services would be performed in Wisconsin because it was in Wisconsin that Fabry had its manufacturing operation.

Further support for my finding that Spitzer must have contemplated that at least some services would occur in Wisconsin can be found in the several meetings that he had in Wisconsin with representatives of Fabry. To be sure, Spitzer may have used his trips to Wisconsin to accomplish dual purposes—a family summer vacation in Door County and a meeting with representatives of Fabry to discuss various aspects of the contractual relationship he was contemplating in June 1993, and which he had already entered into by July 1994. But the length of time Spitzer spent at the Fabry facilities in Green Bay, Wisconsin, was not insignificant. To the contrary, in June 1993, Spitzer was at Fabry's facilities for approximately a day and a half.

And, during his July 1994 visit, Spitzer arrived at the Fabry facilities on a Thursday and stayed there until Friday evening. (Vanness Aff., ¶ 5).[3]

In sum, I find that Spitzer is subject to jurisdiction in Wisconsin under the contract provisions of the Wisconsin long-arm statute.[4]

## B. Due Process

Finding that Spitzer is subject to jurisdiction in Wisconsin under the provisions of the Wisconsin long-arm statute, however, does not end the inquiry. Even if jurisdiction is proper under Wisconsin's long-arm statute, subjecting Spitzer to suit in Wisconsin must also comport with the principles of due process.

> Personal jurisdiction will not exist if the unique facts of the dispute do not establish that the defendant has "certain minimum contacts with [the forum] such that the maintenance of this suit does not offend 'traditional notions of fair play and substantial justice,'" under the due process clause of the Fourteenth Amendment.... A state cannot force a nonresident to litigate in its courts unless there is "some act by which the defendant purposefully avails himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its law." (Citations omitted).

*Federated Rural Electric Insurance Corp.*, 18 F.3d at 394.

Before a defendant can be haled into court in a specific jurisdiction, he must have had "fair warning" that a particular activity might subject him to the jurisdiction of that foreign sovereign. *Burger King Corp.*, 471 U.S. at 472, 105 S.Ct. at 2182. This "fair warning" requirement is satisfied if the defendant has "purposefully directed" his activities at the residents of the forum

---

**3.** I presume that Dr. Spitzer did not sleep at the facilities of Fabry on Thursday evening. However, the Court will take judicial notice that Door County, Wisconsin, is within reasonable driving distance of Green Bay, Wisconsin, so that Spitzer could have driven to his vacation spot at Door County on Thursday evening and returned to Fabry facilities on Friday morning without undue difficulty.

**4.** Having found jurisdiction under the contract provision of the Wisconsin long-arm statute, it is not necessary for me to determine whether personal jurisdiction would lie under any other applicable provision of the statute. *See, Jadair, Inc. v. Van Lott, Inc.*, 512 F.Supp. 1141, 1144 (E.D.Wis.1981).

and the litigation results from alleged injuries that "arise out of or relate to" those activities. *Burger King Corp., Id.* Once it has been determined that a defendant purposefully established minimum contacts with the forum State, these contacts may be considered in light of other factors in determining whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *Burger King Corp.,* 471 U.S. at 476, 105 S.Ct. at 2184, *citing International Shoe Co. v. Washington,* 326 U.S. at 320, 66 S.Ct. at 160.

■ Minimum contacts can include a physical presence, solicitation of business, or any way that a defendant would avail himself of the benefits and protections of the forum state. *World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 295, 100 S.Ct. 559, 566, 62 L.Ed.2d 490 (1980). This is, of course, consistent with the principle that it cannot be the unilateral activity of a resident who claims a relationship with a nonresident defendant that satisfies the requirement of contact with the forum state. The "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts. ... or the unilateral activity of another party or a third person. *Burger King Corp.,* 471 U.S. at 474–75, 105 S.Ct. at 2183–84. But where a defendant has "deliberately" engaged in significant activities within a state or has created "continuing obligations" between himself and residents of the forum,

> he manifestly has availed himself of the privilege of conducting business there, and because his activities are 'shielded by the benefits and protections' of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Burger King Corp.,* 471 U.S. at 475–76, 105 S.Ct. at 2184.

■ I find that Spitzer purposefully directed his activities towards Fabry and purposefully derived benefits from those activities with Fabry to such a degree that he established minimum contacts in Wisconsin. First of all, although his initial effort to solicit business with Fabry was unsuccessful, he did ultimately enter into an agreement with Fabry. He created (at least for a short period of time), "continuing obligations" between himself and Fabry. *Burger King Corp.,* 471 U.S. at 475–76, 105 S.Ct. at 2184. Because Spitzer knowingly reached out to a Wisconsin business and created a continuing relationship with that business, I cannot say that Spitzer's contacts with Wisconsin were "random," "fortuitous," or "attenuated." To the contrary, I find that Spitzer purposefully directed his efforts towards a resident of Wisconsin, (i.e., Fabry), to such a degree that he could reasonably foresee being subjected to the jurisdiction of a Wisconsin court. *Hartwig,* 913 F.2d at 1219.

Indeed, Fabry performed a service for Spitzer in Wisconsin by working on the design of the glove into which the pad was to be incorporated. The fact that a plaintiff performs a substantial amount of a contract in the forum state constitutes another meaningful contact between the defendant and the forum. *Hartwig,* 913 F.2d at 1219. Spitzer certainly could have reasonably anticipated such service being performed in Wisconsin at the time he established a business relationship with Fabry.

Furthermore, although physical presence is not essential to establishing such minimum contacts, "territorial presence frequently will enhance a potential defendant's 'affiliation with the state' and reinforce the reasonable foreseeability of suit there." *Burger King Corp.,* 471 U.S. at 476, 105 S.Ct. at 2184. It is undisputed that Spitzer did travel to Wisconsin on at least three occasions and met with representatives of Fabry for the reasons described above.

Finally, it is undisputed that information and materials were regularly transmitted back and forth between Spitzer and Fabry by telephone, fax and mail. It is also undisputed that at least two royalty checks were mailed to Spitzer from Fabry in Wisconsin. As the Court held in *Burger King Corp., supra:*

> [I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines,

thus obviating the need for physical presence within a State in which business is conducted. So long as a commercial actor's efforts are "purposely directed" toward residents of another state, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.

471 U.S. at 476, 105 S.Ct. at 2184.

■ Having found that Spitzer purposefully established minimum contacts within Wisconsin, I now should consider these contacts in light of other factors to determine whether the assertion of personal jurisdiction would comport with "fair play and substantial justice." *International Shoe Co. v. Washington,* 326 U.S. at 320, 66 S.Ct. at 160; *Burger King Corp.,* 471 U.S. at 476, 105 S.Ct. at 2184. In this connection, I may evaluate such matters as the burden on the defendant, the forum state's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies and the shared interest of the several States in furthering fundamental substantive social policies. *World–Wide Volkswagen Corp,* 444 U.S. at 292, 100 S.Ct. at 564.

I find that jurisdiction over Spitzer falls well within the notions of "fair play and substantial justice." First of all, the Wisconsin courts have a definite interest in providing a forum which affords its citizens an opportunity to resolve disputes with non-residents. *Zerbel v. H.L. Federman & Co.,* 48 Wis.2d 54, 64–66, 179 N.W.2d 872, 878–79 (1970). Moreover, the burdens imposed on Spitzer in defending this action in Wisconsin are not so oppressive as to violate the notions of fair play and substantial justice. While I recognize that he is an individual and not a corporation, Spitzer is not being haled into a court that is located half-way across the country. To the contrary, Wisconsin and Michigan border one another, and their respective residents regularly travel to and from the other for business as well as for pleasure.

Moreover, I note that it is not only Spitzer who will have to travel in order to have his case heard. The plaintiff will also have to travel some distance in order to have its case heard because Green Bay is located approximately 125 miles from Milwaukee, Wisconsin. And, even were the defendant to be sued in Michigan, he would, nevertheless, be required to absent himself from his medical practice in order to defend the allegations made against him.

In conclusion, for all of the reasons set forth above, I find that the exercise of personal jurisdiction over Spitzer comports with the Wisconsin long-arm statute, as well as with due process. **THEREFORE, IT IS ORDERED** that Spitzer's Motion to Dismiss on the basis of lack of personal jurisdiction be **DENIED.**

A telephonic scheduling conference will be conducted in this matter on the 11th day of January, 1996, at 9:00 a.m. The Court will initiate the call.

At this conference, counsel for each party should be prepared to provide the following information as required by Local Rule 7.04:

1. A brief statement of the nature of the case.

2. The nature of further discovery each party contemplates and the amount of time it may take to complete discovery.

3. Any motions which are contemplated at this time.

4. The estimated trial length and whether a jury is requested.

5. Such other matters as may affect further scheduling of this case for final disposition.

It is anticipated that the parties will have completed mandatory discovery pursuant to Local Rule 7.07 prior to the scheduling conference.

**SO ORDERED.**